FREDERICK R. HORNE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5247. Promulgated June 15, 1945.

*Donald Marks, Esq.,* for the petitioner.
*Bernard J. Long, Esq.,* for the respondent.

#### OPINION.

SMITH, *Judge*: This proceeding involves a deficiency of $3,450 in petitioner's income tax for 1941. The only question in issue is whether petitioner is entitled to a loss deduction on the sale of a membership certificate in the New York Coffee and Sugar Exchange, Inc.

The proceeding was submitted on the following stipulation of facts:

1. Petitioner, FREDERICK R. HORNE, is a resident of the City and State of New York, and filed his income tax return for the calendar year 1941 with the Collector of Internal Revenue, Second New York District. He has been in the commodity import and export business for twenty-two years and has acted as a broker and dealer throughout this period. Petitioner has specialized in the handling of sugar.

2. In connection with petitioner's activities in the sugar trade, he has been a member of the New York Coffee and Sugar Exchange since 1925. From 1929 to 1942, petitioner devoted a substantial portion of his time to trading in sugar futures contracts on the floor of said Exchange. Petitioner's activities consisted of acting as a broker for others in executing contracts on the floor of said Exchange and also in trading for his own account and for the account of his firm, Slaughter, Horne & Company. The trading for petitioner's own account and for the account of his firm consisted largely of hedging and arbitrage operations and seldom involved the taking of a long or short position in sugar futures.

3. Membership in the New York Coffee and Sugar Exchange was essential to petitioner in the operation of his business, both in connection with the commissions earned as broker for others and in connection with the operations for his own and his firm's account.

4. From 1925 until 1929, petitioner was a member of the New York Coffee and Sugar Exchange as a nominee of the Sugar Sales Corporation, for which company

petitioner acted on the floor of the Exchange. On June 1st, 1929, petitioner resigned from the Sugar Sales Corporation and became a partner of Charles Slaughter in the firm of Slaughter, Horne & Company, with which firm he continued to be associated during the year 1941. In 1929, it was necessary for petitioner to acquire a membership in the New York Coffee and Sugar Exchange for his own benefit in order to trade on the floor of the Exchange as a member on behalf of the firm of Slaughter, Horne & Company. Said firm operated both as a broker for the account of others and as a dealer for its own account in the handling of sugar, coffee and other commodities and in trading on the Exchange both in hedging and arbitrage operations in connection with its dealings in physical commodities for its own account. On July 25th, 1929, petitioner purchased Membership No. 133 in said Exchange. The cost thereof was $24,000, and petitioner paid this sum in cash.

5. Purchases and sales of memberships on the Exchange are effected through the Secretary's office. Members who intend to sell their memberships lodge their offerings with the Secretary and persons intending to buy memberships lodge their bids with the Secretary. Purchasers and sellers do not deal directly with each other.

6. On November 24th, 1941, petitioner purchased Membership No. 171 in the New York Coffee and Sugar Exchange from Armant Legendre. This purchase was consummated by petitioner filing his bid with the Secretary of the Exchange, and petitioner did not know from whom the membership was purchased until the transaction was consummated. The purchase was made under the following circumstances: Petitioner first inquired of the Secretary of the Exchange as to the market for memberships and was informed that a membership was offered at a price slightly over $1100. Petitioner then placed a bid with the Secretary of $1100. and was later informed that his bid had been accepted.

7. On December 2nd, 1941, petitioner sold Membership No. 133 for $1,000. to A. Dorr. The sale was effected under the following circumstances: Petitioner inquired of the Secretary of the Exchange as to the market for memberships and was informed that there was a bid with the Secretary for one membership at $1,000. Petitioner then informed the Secretary that he would accept said bid. Petitioner did not know who the buyer was until the sale had been consummated through the Secretary's office.

8. During the months of November and December, 1941, the following sales of memberships on the Exchange took place at the prices indicated:

| November | 7th | 1 at | $1,300. | December | 9th | 1 at | 800. |
|---|---|---|---|---|---|---|---|
| | 21st | 2 " | 900. | | 19th | 1 " | 800. |
| | 24th | 2 " | 1,100. | | 19th | 1 " | 750. |
| | 25th | 2 " | 1,100. | | 22nd | 1 " | 950. |
| | 27th | 1 " | 1,000. | | 26th | 2 " | 800. |
| December | 2nd | 1 " | 1,000. | | 30th | 1 " | 800. |
| | 3rd | 1 " | 800. | | 30th | 1 " | 750. |

9. At the time of purchase of Membership No. 171 on November 24th, 1941, petitioner intended to sell Membership No. 133, and Membership No. 171 was acquired prior to the sale of Membership No. 133 in order that the continuity of petitioner's membership in the Exchange should not be broken. Petitioner's only purposes in the purchase of Membership No. 171 and the sale of Membership No. 133 as herein stated were:

(a) To establish a loss upon the sale of Membership No. 133 in order to utilize such loss as a tax deduction, if permissible, and

(b) To remain a member of the Exchange without interruption.

The acquisition of Membership No. 171 gave petitioner no rights or privileges of membership which he did not then possess as the owner of Membership No. 133; and the sale of Membership No. 133 did not terminate any rights or privileges of membership which petitioner then enjoyed as owner of Membership No. 171.

10. On petitioner's 1941 income tax return, he deducted the sum of $11,500. (50% of $24,000. minus $1,000.) as a net long term capital loss. The Commissioner disallowed this deduction.

11. The New York Coffee and Sugar Exchange is a membership corporation organized under Special Act of the Legislature of the State of New York, being Chapter 393 of the Law of 1885, adopted June 2nd, 1885, and governed by the Membership Corporations Law of the State of New York. The purposes set forth in the Act of Incorporation were as follows:

> The purposes of said corporation shall be to provide, regulate and maintain a suitable building, room or rooms for the purchase and sale of coffees and other similar grocery articles in the city of New York, to adjust controversies between its members, to inculcate and establish just and equitable principles in the trade, to establish and maintain uniformity in its rules, regulations and usages, to adopt standards of classification, to acquire, preserve and disseminate useful and valuable business information, and generally to promote the above mentioned trade in the City of New York, increase its amount, and augment the facilities with which it may be conducted.

12. The New York Coffee and Sugar Exchange has 310 members, who own collectively a total of 344 memberships. These memberships (as in the case of other commodity and security exchanges), are commonly known as "seats".

13. The New York Coffee and Sugar Exchange maintains facilities for trading in futures contracts for sugar, coffee and molasses. The Exchange owns the building at No. 66 Beaver Street, New York City. In the building, the Exchange has a trading floor and executive offices. Members only are permitted on the trading floor where they engage in the buying and selling of the commodities above described for their own account and as brokers for the account of others. The Exchange itself does not engage in trade of any kind. Its operating budget to cover maintenance of the exchange facilities is met by the dues and assessments levied upon its members. The Exchange has not had an operating profit from the building at No. 66 Beaver Street for many years; but in those years when such revenue was derived from the real estate, it served to reduce the amount of the dues and assessments levied upon members to meet the operating budget of the Exchange.

14. The New York Coffee and Sugar Exchange is not operated for profit. The amount of dues and assessments levied from year to year is adjusted simply to meet the operating expenses. A surplus remaining in any one year is applied in reduction of dues and assessments in the next. In no event is the Exchange empowered to distribute any earnings or declare any dividends to its members.

15. The members of an Exchange enjoy certain personal privileges which include the right to trade upon the floor of the Exchange at members' rates of commission. A non-member may not be present upon the floor and may not trade as a broker for others or for his own account. A non-member must have his trading done by members and his contracts must be carried by members. The right of a member to engage in trading upon the floor of the exchange for his own account, or for the account of others, gives the membership a value according to the degree of activity of the particular market. The earning power of the membership when used by one who acts as a broker for others or the economic contribution of a membership to the business of a member who trades for his own account will determine the value of the membership at any par-

ticular time. Thus, the primary value of a membership lies in its relation to the trade or business of the member.

16. Membership in the New York Coffee and Sugar Exchange is not freely alienable and may not be disposed of by gift, devise or sale except as permitted by the by-laws of the Exchange. A member may sell his membership only to another member or to an applicant for membership who has been approved by the Board of Managers of the Exchange and duly elected to membership. An applicant for membership must pass a careful examination by an Admissions Committee and the Board of Managers in electing an applicant acts only upon the recommendation of such Committee.

17. A membership in the New York Coffee and Sugar Exchange is not immune to impairment by action of the Exchange. A member of the Exchange is subject to disciplinary action by the Exchange, which may result in expulsion and loss of his membership. An applicant for membership must agree to abide by the By-laws, Rules and Regulations of the Exchange and for breach thereof, he may be subject to disciplinary procedure by the duly constituted tribunals of the Exchange. The loss of such membership rights results in an involuntary sale of the membership by the Exchange. * * *

In his income tax return for 1941 petitioner claimed a long term capital loss deduction of $11,500, on account of the sale of exchange certificate No. 133, which is 50 percent of the difference between what he paid for it in 1929, $24,000, and what he sold it for in 1941, $1,000. The respondent disallowed the deduction on the ground that the transaction constituted a "wash sale" within the purview of section 118 of the Internal Revenue Code. Petitioner's return showed a net income of $9,632.13, which the respondent increased, with other adjustments not here in controversy, to $22,262.40.

Section 118 of the Internal Revenue Code deals only with sales of "shares of stock or securities." Its purpose was to prevent the deduction of fictitious losses from such sales where within 30 days from the date thereof the taxpayer purchased identical stocks or securities.

It is plain that the section has no application to the sale of properties other than stocks and securities. We do not think that a certificate of membership in the New York Coffee and Sugar Exchange, Inc., is either a share of stock or a security within the meaning of section 118. The exchange is a nonprofit corporation organized under the "Membership Corporations Law" of the State of New York. The certificates of membership are not dealt in either as commodities of trade or for investment purposes. Their sale is closely restricted and is subject to the approval of the governing body. Since the revenue statutes carry no definition of either the term "shares of stock" or "securities" as used in section 118, the terms must be given their ordinary meaning. A security was defined in *In re Waldstein*, 291 N. Y. S. 697; 160 Misc. 763, as follows:

The term "security" has no exactly defined legal definition. Generically the word has reference to written instruments, usually for the payment of money or evidences of a debt, and being more than a mere promise of the debtor of a

general liability on his part, but having as collateral to it a pledge of property or some additional obligation * * *.

* * * It is now generally used to refer to instruments for the payment of money, or evidencing title or equity, with or without some collateral obligation, and which are commonly dealt in for the purpose of financing and investment.

* * * Those instruments, however, secured or unsecured, which are used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are termed securities.

That definition would not fit the exchange membership certificate under consideration, nor has the respondent cited any that would. We must therefore reject respondent's contention that section 118 is applicable.

For other reasons, however, which respondent also urges in his brief, we are of the opinion that the deduction claimed must be disallowed.

Underlying all of the loss deduction provisions of the statute is the concept of a financial detriment actually suffered by the taxpayer. Before any deduction is allowable there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense. That principle was thoroughly expounded by the court in *Shoenberg* v. *Commissioner* (C. C. A., 8th Cir.), 77 Fed. (2d) 446, affirming 30 B. T. A. 659; certiorari denied, 296 U. S. 586. There the taxpayer, for the purpose of establishing a tax loss, sold shares of stock through a broker at less than their cost and at the same time had the broker purchase a like number of the same shares for a wholly owned corporation. After the expiration of 30 days he then had the corporation transfer the shares back to him. In sustaining our disallowance of the loss deduction claimed the court said:

Among the "transactions" or "identifiable events" which may operate to realize and fix a loss, the most commonly occurring is a sale of the property. Here there was an actual sale of these shares, and, if our examination must stop with that sale, this loss is conclusively shown. The questions here are whether we can consider the entire situation which comprehends this sale, the purchase by the Globe Investment Company and the sale by it to the taxpayer; and, if we can, the effect thereof upon the above loss as being a deductible loss.

It would seem there could be no doubt of the propriety of examining all matters, relating to the sale by the taxpayer, which bear upon the deductible character of the loss shown by that sale. There are many cases involving deductions from federal income taxes wherein the entire transactions on account of which the deduction was claimed have been examined. * * *

Referring at that point to *Gregory* v. *Helvering*, 293 U. S. 465, the court continued:

The place of a sale in claiming a deduction is as evidence that a loss has been realized. If the sale is real and is an isolated transaction, it is conclusive proof. If it is only part of an entire plan, then the entire plan is examined to ascertain whether its effect is to produce a loss or a realized loss. It is immaterial that

the motive prompting the sale or the plan of which the sale was a part was to secure a deduction. The matter of interest is whether an actual loss has been realized. Tax laws deal with realities (*Helvering* v. *Security Savings & Commercial Bank*, 72 F. (2d) 874 (C. C. A. 4) ; *MacQueen & Co.* v. *Comm.*, 67 F. (2d) 857 (C. C. A. 3) ), and look at the entire transaction (cases just cited and *Ahles Realty Corp.* v. *Comm.*, 71 F. (2d) 150 (C. C. A. 2) ). Two very recent cases (*Commissioner* v. *Dyer*, 74 F. (2d) 685, and *Marston* v. *Comm.*, 75 F. (2d) 936), in the Second Circuit, taken together, reveal the rule as to sales and repurchases. In the *Dyer* Case, there were sales and repurchases both parts of an original entire plan, and the claimed deductions were denied. In the *Marston* Case there was a sale with no intention or plan to repurchase, but there was a later repurchase, and the claimed deduction on account of the sale was allowed.

To secure a deduction, the statute requires that an actual loss be sustained. An actual loss is not sustained unless when the entire transaction is concluded the taxpayer is poorer to the extent of the loss claimed; in other words, he has that much less than before.

A loss as to particular property is usually realized by a sale thereof for less than it cost. However, where such sale is made as part of a plan whereby substantially identical property is to be reacquired and that plan is carried out, the realization of loss is not genuine and substantial; it is not real. This is true because the taxpayer has not actually changed his position and is no poorer than before the sale. The particular sale may be real, but the entire transaction prevents the loss from being actually suffered. Taxation is concerned with realities, and no loss is deductible which is not real.

We have quoted rather extensively from the court's opinion because the discussion so aptly fits the situation in the instant case.

Another case in point is *Joseph W. Powell*, 34 B. T. A. 655; affd. (C. C. A., 1st Cir.), 94 Fed. (2d) 483.

Petitioner here concedes, as set out in the stipulation, not only that the purchase of the new certificate and the sale of the old one were for the purpose of establishing a tax loss, but also that both of those transactions were component parts of a unified plan to carry out that purpose. It is no aid to the petitioner, of course, that the new certificate was purchased before rather than after or at the same time of the sale of the old one. That was done to assure petitioner uninterrupted membership in the exchange and in the use of the exchange's facilities. The numerical identification of the certificates meant nothing to the petitioner and the temporary ownership of two certificates was of no business advantage to him.

Putting aside other considerations, the persuasive fact is that after consummation of the plan which petitioner had put into operation eight days previously he stood in exactly the same position as before, except that he was out of pocket $100, the difference between what he paid for his new certificate and what he received for his old one. One "seat" was exactly like another. As to how the $100 should be treated for tax purposes we are not now required to decide. Petitioner never divested himself of the rights which he enjoyed by reason of his membership in the exchange, and never intended to do so. Although he went through the form of purchasing one certificate and selling an-

other, the result was the same as if he had exchanged his certificate for that of another member. The deduction of a loss on such an exchange, that is, an exchange of property held for productive use in trade or business for property of a like kind to be held for such use, is expressly denied by section 112 (b) (1) of the Internal Revenue Code.

We think that petitioner suffered no loss on the sale of his exchange certificate and that the respondent properly disallowed the deduction claimed.

*Decision will be entered for the respondent.*