ALSON N. JOHNSON AND MARGARET C. JOHNSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5916-73.    Filed August 24, 1976.

*Daniel R. Dixon,* for the petitioners.
*Eric B. Jorgenson,* for the respondent.

SIMPSON, *Judge:* The Commissioner determined a deficiency in the petitioners' Federal income tax for 1971 of $6,768.70. The issues to be decided are: (1) Whether a partnership incurred an abandonment loss in 1971 prior to its termination, or whether the petitioner, a partner in such partnership, realized a loss on the liquidation of his interest in the partnership; and (2) whether the petitioner was compensated for such loss by the proceeds of life insurance paid to him due to the death of his partner.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

---

[1] An adjustment of the petitioners' medical deduction will be necessary if the Commissioner's increase of their adjusted gross income is sustained.

The petitioners, Alson N. and Margaret C. Johnson, husband and wife, maintained their legal residence in Fuquay-Varina, N. C., at the time of filing their petition herein. They filed their joint Federal income tax return for 1971, using the cash receipts and disbursements method of accounting, with the Internal Revenue Service Center, Chamblee, Ga. Dr. Alson N. Johnson will sometimes be referred to as the petitioner.

In 1969, the petitioner and Robert J. Chappell formed a partnership, known as Chappell & Johnson Swine Enterprise of Fuquay-Varina, N. C. (C. & J.), to engage in the business of breeding and raising hogs for sale. The petitioner furnished all the capital for the partnership, and Mr. Chappell managed the business and furnished the land on which the hogs were raised. The partnership used the cash receipts and disbursements method of accounting.

C. & J. leased sows and boars from Kleen Leen, Inc. (Kleen Leen), which were bred to produce pigs. The sows and boars remained the property of Kleen Leen, and C. & J. paid a rental fee for their use. The newborn pigs became the property of C. & J. and were raised by it.

The written partnership agreement creating C. & J. originally provided that Mr. Chappell was to receive 60 percent of the partnership income and that the petitioner was to receive 40 percent, but it was later modified by the partners to allocate 55 percent to Mr. Chappell and 45 percent to the petitioner. Although the written partnership agreement provided that all losses were to be borne by the partners in the same proportion as income was to be allocated, the partners orally agreed that the petitioner was "responsible" for all losses. The written partnership agreement also provided that the partnership was to continue until one of the partners gave the other 90-days written notice of his intention to dissolve the partnership. In addition, it was agreed that the partnership would not dissolve upon the death of a partner and that the wife of either partner could continue the partnership. In the event of dissolution of the partnership, the written agreement provided that the petitioner was to be paid the cost, less depreciation, of all facilities.

Soon after the partnership was started, the petitioner purchased a 5-year convertible term life insurance policy in the face amount of $14,000 on the life of Mr. Chappell. The policy provided for double indemnity in the case of accidental death,

and the petitioner was designated as the beneficiary of the policy. The petitioner knew that Mr. Chappell had a heart problem and felt that he needed the life insurance to protect the capital he was investing in C. & J. in the event of the death of Mr. Chappell. He determined that a $14,000 life insurance policy was sufficient to protect his investment in C. & J. since he had invested about $12,000 at that time and planned to invest about $4,000 more. He felt that he could absorb a $2,000 or $3,000 loss, if necessary. Funds from the partnership's bank account were used to pay the premiums on the policy.

During 1970, the petitioner made capital contributions to the partnership of $28,858.17. C. & J. used such funds to construct buildings on a 50-acre tract of land (50-acre tract) owned by Mr. Chappell and his wife and to install the necessary equipment for raising hogs. C. & J. incurred a net loss of $11,511.55 from its operations in 1970. C. & J. did not file a partnership return, and the petitioners deducted such loss on Schedule C of their 1970 Federal income tax return as an individual loss.

On May 4, 1971, Mr. Chappell was accidentally killed. Neither the petitioner nor Mrs. Chappell was qualified to manage C. & J.'s business. Although they briefly attempted to find someone to manage the business, they were unsuccessful and decided to terminate the business. The petitioner met with Mrs. Chappell's attorney to arrange a settlement of C. & J.'s affairs. Before July 1971, an agreement was reached providing that the petitioner would forgo any claim to C. & J.'s buildings and equipment located on the 50-acre tract, and that Mrs. Chappell would pay C. & J.'s outstanding debt of approximately $15,000 to Kleen Leen. At the time of his death, Mr. Chappell was financially insolvent.

By June 7, 1971, Kleen Leen had removed all but 13 of the sows leased to C. & J. The remaining sows and C. & J.'s pigs were kept until the pigs grew to a proper size for sale. The last of them was sold in November 1971, and all of C. & J.'s bills were paid by early December 1971, except for that due to Kleen Leen, which Mrs. Chappell paid in 1973. Without taking into consideration any allowance for depreciation, C. & J. incurred a loss of $1,001.38 as a result of its operations during 1971. In July or August 1971, the petitioner received payment of $28,000 under the life insurance policy on Mr. Chappell's life. He used these proceeds for personal purposes.

In December 1971, Mrs. Chappell sold the 50-acre tract. No attempt was made to remove any of the hog-raising buildings or equipment.

During the first 5 months of 1971, the petitioner made capital contributions of $3,600 to C. & J. In November 1971, he withdrew $2,000 from C. & J.'s bank account. At the end of 1971, C. & J.'s bank account had a balance of $131.17, which was withdrawn by the petitioner in January 1973.

C. & J. also filed no partnership return for 1971. On their joint Federal income tax return for 1971, the petitioners reported the income and deductions of C. & J. on Schedule C as follows:

*Swine operation*

| | | |
|---|---:|---:|
| Sales | | $8,136.54 |
| Expenses: | | |
| Feed | $7,721.84 | |
| Lights | 184.82 | |
| Repairs | 15.00 | |
| Misc. supplies—off. | 79.43 | |
| Insurance | 34.66 | |
| Interest | 370.64 | |
| Heat | 731.53 | |
| Depreciation | 19,612.83 | 28,750.75 |
| Net loss | | (20,614.21) |

In his notice of deficiency, the Commissioner determined that $18,830.31 of the claimed depreciation was not allowable since the petitioner had a valid claim against the estate of Mr. Chappell. In an amendment to the answer, the Commissioner alleged that the claimed deduction was not allowable because any loss that the petitioners may have suffered was recouped by insurance.

OPINION

Both parties agree that the petitioner realized a loss in 1971 as a result of his investment in C. & J., but they disagree as to the nature of such loss. The petitioner argues that C. & J.'s hog-raising facilities became obsolete in 1971 and were abandoned by it and that therefore he may deduct his distributive share of the loss as an ordinary loss. See secs. 1.167(a)-8(a)(4) and 1.167(a)-9, Income Tax Regs.; see also secs. 702 and 704(a), I.R.C. 1954.[2] The Commissioner, on the other hand, argues that C. & J.'s facilities

---

[2] All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

were not obsolete or abandoned and that the partnership sustained no loss as a result of the abandonment of such facilities. Rather, he contends that the petitioner realized a capital loss upon the liquidation of his interest in C. & J. See secs. 731(b) and 741. We agree with the Commissioner.

The affairs of C. & J., including the winding up of its affairs, were conducted somewhat informally, and that informality makes it difficult to ascertain the precise nature of some of the transactions. Yet, it appears that when in May or June of 1971, the petitioner entered into the agreement with Mrs. Chappell to forego any claim to C. & J.'s hog-raising facilities on her land in exchange for her assumption of the Kleen Leen liability, the partnership thereby transferred its interests in the hog-raising facilities, and as a result of such transfer, no loss was sustained by the partnership in connection with such facilities. Section 731 provides that a partnership shall not recognize gain or loss on the distribution of property or money to a partner. Thus, if the settlement with Mrs. Chappell is viewed as a distribution of the hog-raising facilities located on her land, C. & J. may not recognize a loss on the distribution. On the other hand, if the transaction is viewed as an exchange of C. & J.'s facilities for Mrs. Chappell's assumption of the partnership's obligation to Kleen Leen, no loss may be recognized since section 707(b)(1)(A) prohibits the deduction of any loss on sales or exchanges of property between a partnership and a partner who owns more than 50 percent of the capital or profits interest in such partnership. Cf. *Collin v. United States,* 57 F. Supp. 217, 218 (N.D. Ohio 1944). Furthermore, after the transaction, the hog-raising facilities became the property of Mrs. Chappell, and any loss sustained in connection with the disposition of them by her is attributable to her.

The petitioner argues that he merely relinquished a personal claim against the estate of Mr. Chappell in exchange for Mrs. Chappell's promise to pay C. & J.'s debt to Kleen Leen and that C. & J. continued to own the hog-raising facilities. However, Mrs. Chappell's attorney testified that the agreement with the petitioner was to extinguish "*any* claim which they may have on the land by virtue of the buildings that were built there." (Emphasis supplied.) Mrs. Chappell was acting with the assistance of counsel, and we cannot accept that she and her counsel would have agreed to assume the liability to Kleen Leen

solely in exchange for the release of a personal claim by the petitioner against her husband's estate. The petitioner concedes in his brief that any claim he had against Mr. Chappell's estate was uncollectible; yet, Mrs. Chappell agreed to pay C. & J.'s substantial obligation to Kleen Leen. We can only conclude that the reason she did so was to acquire a clear title to the 50-acre tract, free of all claims to C. & J.'s buildings situated thereon. The agreement between the petitioner and Mrs. Chappell was an integral part of a plan to liquidate and terminate C. & J. Looking to the substance of what took place, we are convinced that such agreement conveyed C. & J.'s interest in the hog-raising facilities to Mrs. Chappell. Thus, C. & J. did not abandon its assets. Cf. *Orrin W. Fox,* 50 T.C. 813 (1968), affd. per curiam by an unreported order (9th Cir. 1970).

We also find that C. & J.'s hog-raising facilities did not become obsolete during 1971. In *Real Estate-Land Title & Trust Co. v. United States,* 309 U.S. 13, 16-17 (1940), the Supreme Court held that:

obsolescence under the Act connotes functional depreciation, as it does in accounting and engineering terminology. More than non-use or disuse is necessary to establish it. * * * [It] requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced. * * * [Fn. refs. omitted.]

The facts indicate that C. & J. decided to stop using the hog-raising facilities, but there is simply no evidence to show that the facilities had become obsolete.

In his brief, the Commissioner concedes that the petitioner sustained a long-term capital loss in 1971 upon the termination of the partnership. See secs. 731(a)(2) and 741. However, he argues that the petitioner is not entitled to a deduction because he was compensated for such loss by the life insurance received upon Mr. Chappell's death.[3] Sec. 165(a). The petitioner, on the other hand, argues that the life insurance compensated him for the loss of his partner's life, not the loss of his investment in the partnership. Furthermore, he contends that section 165 does not apply to life insurance proceeds.

---

[3] In his brief, the petitioner argues that the Commissioner's claim concerning the life insurance was a new issue raised in his amended answer so that he bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure. However, we need not decide whether such claim presents a new issue, since the facts are clear and our conclusion would be the same irrespective of which party has the burden of proof.

Section 165(a) provides, as a general rule, that "There shall be allowed as a deduction any loss sustained during the taxable year and *not compensated for by insurance or otherwise.*" (Emphasis supplied.) In discussing the purpose of such allowance, we said:

> Underlying all of the loss deduction provisions of the statute is the concept of a financial detriment actually suffered by the taxpayer. Before any deduction is allowable there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense. * * * [*Frederick R. Horne,* 5 T.C. 250, 254 (1945).]

Under the circumstances of this case, we find that, as a result of the insurance proceeds, the petitioner suffered no financial detriment by reason of his investment in C. & J.

Both the petitioner and the agent who sold the life insurance testified that the reason that the petitioner purchased the insurance policy on the life of Mr. Chappell was to protect the petitioner's investment in C. & J. The petitioner recognized that he needed Mr. Chappell to manage the hog-raising business, that Mr. Chappell had recently experienced medical problems, and that should Mr. Chappell die, there was a great risk of losing his investment in the business. Thus, he determined that the face amount of the insurance policy should be approximately equal to his capital investment in C. & J. at that time. The policy provided only term insurance protection and was to continue for only a limited period. All of these circumstances indicate that the life insurance was intended to compensate the petitioner for the loss of his investment, and that is precisely what it did.[4] Consequently, the petitioner did not incur a deductible loss. Sec. 165(a).

The petitioner argues that the payment of the life insurance proceeds did not depend upon the partnership incurring a loss and that his purpose in purchasing the policy is irrelevant. However, that argument ignores the realities of the situation. The petitioner knew that C. & J. would, in all probability, fail if Mr. Chappell died, and it was to protect against the loss of such investment that he purchased a life insurance policy on Mr. Chappell's life. Even though such policy was not dependent upon

---

[4] Because of the differences between generally available life insurance policies and medical insurance, our conclusion in this case is reconcilable with *Robert O. Deming, Jr.,* 9 T.C. 383 (1947). In that case, it was held that medical expenses were compensated only by insurance purchased for that risk, but since there is no life insurance generally available that is restricted to the particular risk involved in this case, no similar rule could be applied in this case.

the petitioner's loss of his investment in C. & J., it is clear that such policy was acquired to protect against such loss and did in fact "compensate" him for the loss.

The petitioner also argues that life insurance is not "insurance" within the meaning of section 165(a), but cites no authority for such argument. He further argues that since life insurance proceeds are generally excludable from gross income pursuant to section 101(a), such proceeds cannot be used to offset a loss under section 165(a), and that to do so would have the effect of taxing the life insurance proceeds. We disagree.

Section 165 limits the deduction to actual loss. "Substance and not mere form shall govern in determining a deductible loss." Sec. 1.165-1(b), Income Tax Regs. Consequently, if a taxpayer is reimbursed for his loss, he has not sustained an actual loss, irrespective of whether the reimbursement is taxable income. See *Dunne v. Commissioner,* 75 F.2d 255 (2d Cir. 1935), affg. 29 B.T.A. 1109 (1934). Whether there has been compensation for a loss within the meaning of section 165(a) is analogous to the question of whether a recovery should be taxable by reason of the tax benefit rule. Cf. *Spitalny v. United States,* 430 F.2d 195, 198 (9th Cir. 1970). It has been held that the recovery of an item giving rise to a prior deduction is taxable to the extent of the prior tax benefit, even though the recovery would not otherwise be taxable. See *Connery v. United States,* 460 F.2d 1130 (3d Cir. 1972); *Spitalny v. United States, supra; Estate of David B. Munter,* 63 T.C. 663 (1975); compare *Putoma Corp.,* 66 T.C. 652 (1976).

*Decision will be entered for the respondent.*