ARTHUR E. AND GLENDA BRAUER, PETITIONERS V.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2825–78.     Filed September 3, 1980.

*John E. Russell*, for the petitioners.
*David J. Duez*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency of $19,385 in petitioners' income tax for the taxable year ended December 31, 1974.

Due to concessions, the only issue for decision is whether petitioners' transfer of their interest in a 239-acre farm and acquisition of a 645-acre farm constituted an exchange which qualifies for nonrecognition of gain, except to the extent of boot, under section 1031, I.R.C. 1954.[1]

### FINDINGS OF FACT

Some of the facts were stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Petitioners Arthur E. Brauer and Glenda Brauer (hereinafter petitioners), husband and wife, resided in St. Louis, Mo., when

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue, unless otherwise noted.

they filed their petition in this case. They filed a joint Federal income tax return for 1974 with the Internal Revenue Service Center, Kansas City, Mo.

In 1968, petitioners purchased, as tenants by the entirety, 239 acres of farmland located in St. Charles County, Mo. (hereinafter St. Charles farm).

On February 22, 1974, petitioners entered into a 6-month exclusive-listing agreement with Stealey Building & Realty Co. (hereinafter Stealey Realty) for the sale of the St. Charles farm at a total purchase price of $298,750 ($1,250 per acre). In the event the property was sold, Stealey Realty was to receive a 6-percent commission.

Stealey Realty located a group of individuals, Henry Tochtrop, Walter Tochtrop, and Geraldine Kerkemeyer (hereinafter Tochtrop group), who were interested in acquiring the St. Charles farm. The Tochtrop group owned a commercially zoned 10-acre tract which it wanted to exchange for petitioners' farm. Milor Realty Co. of St. Louis (hereinafter Milor Realty) was interested in acquiring the 10-acre tract owned by the Tochtrop group. Petitioner had no interest in acquiring this 10-acre tract. The Tochtrop group and Milor Realty, therefore, executed a contract under which the Tochtrop group agreed to transfer its 10-acre tract, plus cash, to Milor Realty in exchange for the St. Charles farm, which Milor Realty agreed to acquire from petitioners.

On March 15, 1974, petitioners entered into an unconditional contract to sell the St. Charles farm to Milor Realty for the price of $298,750, payable $5,000 as an earnest deposit, $248,900 in cash at closing, and by Milor Realty's assumption of a $44,850 deed of trust on the property. Closing was set for May 8, 1974. The contract specified that a commission of $15,425 was to be paid to Stealey Realty, and one of $2,500 was to be paid to Sandfam Corp. (a corporation owned by an agent of Milor Realty). This contract was expressly approved by the Tochtrop group.

The earnest money deposit of $5,000 was paid by Milor Realty to Stealey Realty and was deposited by the latter corporation in an escrow account.

Subsequent to March 15, 1974, petitioner Arthur E. Brauer (hereinafter Brauer) decided that, due to the capital gains tax consequences which would result from the sale of the St. Charles

farm, he wanted to acquire another tract of land, in a nontaxable exchange, for the St. Charles farm.

Brauer was familiar with a 645-acre farm in Gasconade County, Mo. (hereinafter Gasconade farm), owned by Chester B. Franz, Inc. (hereinafter Franz). Prior to March 15, 1974, Brauer was under the impression that this property was not available for acquisition. Shortly after March 15, 1974, when he learned that the Gasconade farm was available at a cost of approximately $300 per acre, Brauer decided to acquire the property.

After he learned that the Gasconade farm was available, Brauer met with representatives of Stealey Realty concerning the possibility of an exchange[2] of the St. Charles farm for the Gasconade farm. Brauer was informed that an exchange was possible, although it would cost an additional $6,000 in commissions for Stealey Realty and Milor Realty. Brauer agreed to pay this sum.

Stealey Realty thereafter entered into discussions concerning an exchange of the two farm properties with an officer of Milor Realty and with N. B. Sandbothe, who was both an agent of Milor Realty and president of Sandfam Corp. Following these discussions, Stealey Realty, Milor Realty, Mr. Sandbothe, and Brauer orally agreed to have Milor Realty acquire the Gasconade farm and exchange it with petitioners for the St. Charles farm. It was also agreed that the additional $6,000 commission to be paid by Brauer would, after the payment of attorney's fees, be evenly split between Stealey Realty and Mr. Sandbothe.

On May 30, 1974, William Oney (hereinafter Oney), an employee of Stealey Realty, and Franz executed a real estate contract for the purchase and sale of the Gasconade farm. The contract provided for a purchase price of $193,572, payable $2,000 as earnest money upon execution of the contract, with the balance due upon delivery of the deed. The contract specified that the buyer was "William Oney or assignee" and that closing was to take place on or before June 14, 1974. The contract also provided:

This sale contingent on the trade of the Braur [sic] farm in St. Charles County Missouri with Milnor [sic] Realty Corporation.

---

[2]The term "exchange," as used in the findings of fact, is not intended to indicate the character of the transaction for tax purposes. Rather, it is used solely for purposes of convenience.

To be deed as directed by buyer.

This purchase is made with the understanding of the parties that this farm will be traded to * * * [petitioners] by buyer.

The $2,000 in earnest money was paid by Stealey Realty from the $5,000 escrow fund which had been established following Milor Realty's payment of earnest money under the contract of March 15, 1974, for the purchase of the St. Charles farm.

Oney, rather than Milor Realty or one of its employees, entered into the contract for the purchase of the Gasconade farm because, during the time period concerned, the Milor Realty officer originally involved in this transaction died and no other officer or employee of Milor Realty was sufficiently familiar with the transaction so that Milor Realty was willing to execute the contract. Due to these circumstances, it was decided that Oney would execute the real estate contract in order to keep the transaction on track. It was still intended, however, that Milor Realty would receive the warranty deed on the Gasconade farm. This was to be accomplished by Oney's assignment of the contract to Milor Realty, with Milor Realty then purchasing the farm.

Closing for the transfer of each of the properties involved, namely, the St. Charles farm, the Gasconade farm, and the 10 acres owned by the Tochtrop group, was scheduled for June 13, 1974.

At some point prior to the date set for closing, it was discovered during a title search on Gasconade farm that a dispute existed concerning the boundaries of the property. The boundary dispute was not resolved prior to the closing date. Because of this dispute, Milor Realty indicated that it did not want to take title to, nor give a warranty deed on, Gasconade farm.

On June 13, 1974, as part of the closing of the various transfers, Oney assigned by written instrument his interest in the May 30, 1974, contract to Milor Realty. Thereafter, on the same date, Milor Realty assigned by written instrument its interest in that contract to petitioners.

At the same time petitioners received the assignment from

Milor Realty: (a) Petitioners received a general warranty deed on the Gasconade farm from Franz;[3] (b) petitioners conveyed the St. Charles farm by general warranty deed to Milor Realty; and (c) Milor Realty conveyed the St. Charles farm by general warranty deed to the Tochtrop group in exchange for a 10-acre tract and, as will be detailed *infra,* cash.

To complete the above transactions, payments totaling $248,900 were made at closing by the following instruments:

(a) Four cashier's checks totaling $157,000 payable to individual members of the Tochtrop group were endorsed to Milor Realty;

(b) $1,350 was paid to Milor Realty by means of a personal check of a member of the Tochtrop group; and

(c) One cashier's check in the amount of $90,550 payable to Lenette Realty & Investment Co., a name used by Milor Realty for purposes of this transaction, was endorsed to Milor Realty.

Each of the checks noted above were endorsed, in turn, from Milor Realty to petitioners to St. Paul Title Co., the disbursing agent of escrow funds.

In addition to receiving the general warranty deed on the Gasconade farm, petitioners received a check from St. Paul Title Co. in the amount of $36,853. Also, Milor Realty assumed, and paid, a $44,850 deed of trust on the St. Charles farm. Petitioners received no other cash or property.

Franz received a check in the amount of $191,242.47 from St. Paul Title Co. The balance of the $5,000 in the Stealey Realty escrow account was paid as commissions to Stealey Realty and Sandfam Corp., or as attorney's fees. Milor Realty did not receive any fees from the transactions.

On their 1974 joint income tax return, petitioners reported a long-term capital gain of $81,703 from the transactions, computed as follows:

| | |
|---|---|
| FMV of farm received | $193,572 |
| Cash received | 36,853 |
| Mortgage on property given | 44,850 |
| | [1]275,455 |

---

[3]In fact, because officers of Franz did not attend the meeting at which took place the closing of the various transfers, this warranty deed was executed prior to both Oney's and Milor Realty's assignment of the contract rights to purchase Gasconade farm.

Less:

| | | |
|---|---|---|
| Basis of property given | $125,000 | |
| Depreciation | 14,000 | $111,000 |
| Gain realized | | 164,455 |
| Taxable to extent of cash and mortgage received | | 81,703 |

¹These sums total $275,275.

In the statutory notice of deficiency, respondent determined that the disposal by petitioners of the St. Charles farm and their acquisition of the Gasconade farm was a sale followed by a reinvestment and not an exchange of like-kind properties within the meaning of section 1031. Accordingly, a deficiency in tax was determined based upon recognition of petitioners' entire gain.

## OPINION

The principal question to be decided is whether petitioners' transfer of their interest in the St. Charles farm and acquisition of the Gasconade farm constituted an exchange which qualifies for nonrecognition of gain under section 1031.

Section 1031 provides that "no gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."[4] If other property not of a like kind or money—i.e., "boot"—is also received in an exchange, gain is recognized to the extent of such boot. Sec. 1031(b). There is no dispute concerning whether the farms involved were of "like kind," or whether petitioners held the properties for the requisite purposes. The

[4]Sec. 1031 provides in pertinent part:

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

(b) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—If an exchange would be within the provisions of subsection (a), of section 1035(a), of section 1036(a), or of section 1037(a), if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

fact that the farms were of like kind, however, is not sufficient. It is necessary that there be an "exchange" of like-kind property.

Respondent contends that the various transfers did not amount to an exchange because contractual interdependence did not exist between petitioners' transfer and receipt of property. Contractual interdependence is defined by respondent to mean that the essence of any exchange is that (1) the prospective recipient of petitioners' property (or his agent) must transfer to petitioners the property to be received by petitioners; and (2) title to the property received by petitioners must be transferred in consideration for the property transferred by petitioners. According to respondent, the instant transaction lacked contractual interdependence because petitioners acquired the Gasconade farm directly from Franz with no intervening legal or equitable interest being held by Milor Realty, and Franz received only cash. Thus, respondent argues, the transaction was a purchase of the Gasconade farm for cash and a sale of St. Charles farm for cash. Petitioners, of course, argue that the various transfers fit within the framework of section 1031.

As originally structured, petitioners agreed to sell the St. Charles farm outright for cash to Milor Realty, with Milor Realty then exchanging the farm for a 10-acre tract owned by the Tochtrop group. It was only subsequent to the signing of the unconditional sales contract that Brauer, for tax reasons, decided to try to effect a nontaxable exchange of the St. Charles farm for the Gasconade farm. Following this decision, Brauer, Milor Realty, and the real estate agents involved entered into discussions concerning a possible exchange of the properties. As a result of these discussions, it was orally agreed that Milor Realty would acquire the Gasconade farm and exchange it with petitioners for the St. Charles farm.

For reasons explained in our findings of fact, the transaction did not conform to this oral agreement. The details of the transaction, as carried out, are also set forth in our findings of fact. In summary, petitioners received a purchase contract for the Gasconade farm by assignment from Milor Realty, a warranty deed for the Gasconade farm directly from Franz, and $36,853 in cash from the escrow agent. In turn, petitioners transferred the St. Charles farm by warranty deed to Milor

Realty, which in turn transferred it to the Tochtrop group in exchange for the 10-acre tract and cash.

In determining whether as a result of the foregoing transaction petitioners "exchanged" like-kind property so as to come within section 1031, it is first helpful to identify those factors which are not crucial. Although the transaction at issue is somewhat unusual, the presence of multiple parties and transfers of property does not preclude qualification under section 1031. See, e.g., *Barker v. Commissioner*, 74 T.C. 555 (1980). Furthermore, the fact that Milor Realty immediately transferred the St. Charles farm to the Tochtrop group in exchange for cash and a 10-acre tract does not prevent section 1031 treatment. *W. D. Haden Co. v. Commissioner*, 165 F.2d 588 (5th Cir. 1948), affg. on this issue a Memorandum Opinion of this Court.

We also do not believe that crucial to our determination is the fact that petitioners originally signed an unconditional contract to sell St. Charles farm and it was only later that a solely tax-motivated decision was made to effect an exchange of the property. *Alderson v. Commissioner*, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962); *Coupe v. Commissioner*, 52 T.C. 394 (1969). But see *Rogers v. Commissioner*, 44 T.C. 126 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967), which is distinguishable. Futhermore, it is also not crucial that the subsequent agreement by the parties to effect an exchange was oral or that the sales contract was never revoked or amended in writing.

Respondent argues that the failure of the parties to reduce to writing the oral agreement is important. He contends that because the closings of the various transfers were consistent with the written sales contract, i.e., that the St. Charles farm was sold for cash, petitioners are barred by both the *Danielson* rule[5] and the statute of frauds from introducing oral testimony to contradict the terms of the written contract. Leaving for decision, *infra*, whether the various transfers effected a sale of St. Charles farm and a reinvestment in the Gasconade farm, we do not agree with respondent's contention.

In *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S.

---

[5] *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965), cert. denied 389 U.S. 858 (1967).

858 (1967), a case involving the amount allocated in a business-sale agreement to the seller's convenant not to compete, the Third Circuit Court of Appeals held that a party to the agreement could challenge the tax consequences of that agreement "only by adducing proof which in an action between the parties to the agreement would be admissible to alter * * * [respondent's construction thereof] or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." *Commissioner v. Danielson, supra* at 775. We decline respondent's invitation to extend the holding of *Danielson* to the facts of this case.[6]

The tax consequences of the unconditional sales contract are not an issue herein. There is no question whether the contract, when executed, encompassed the parties' entire agreement or whether a negotiated provision in the contract is contrary to the parties' intention. To these types of construction problems are applied the *Danielson* rule and this Court's "strong proof" rule. *Ullman v. Commissioner*, 29 T.C. 129 (1957), affd. 264 F.2d 305 (2d Cir. 1959). See, e.g., *Spector v. Commissioner*, 71 T.C. 1017, 1023 (1979), on appeal (5th Cir., Oct. 3, 1979). See also *Sullivan v. United States*, 363 F.2d 724, 726–727 (8th Cir. 1966). The issue herein is whether subsequent to the execution of the sales contract an agreement was reached to effect an exchange and whether the ultimate transaction was an exchange. Thus, we believe the *Danielson* rule has no application in the instant case.

The statute of frauds is also not applicable. Even if the oral modification of the written contract for the sale of St. Charles farm were required to be in writing under the Missouri statute of frauds (Mo. Ann. Stat. sec. 432.010 (Vernon)), the purpose of the statute is to protect one party from the enforcement of an oral agreement. See *Shaffer v. Hines*, 573 S.W.2d 420 (Mo. Ct. App. 1978); see also *Mustard v. United States*, 140 Ct. Cl. 205, 155 F. Supp. 325, 332–333 (1957). Enforcement of the oral contract is not at issue herein. The property subject to the oral agreement

---

[6]Initially, we note that, regardless of the application of the rule enunciated in *Commissioner v. Danielson, supra*, it would not bar consideration of the oral evidence. "We believe the [*Danielson*] rule involves applying the evidence offered and received to decide whether it meets the standard established to determine whether the terms of the written agreement should or may be varied." *T.F.H. Publications, Inc. v. Commissioner*, 72 T.C. 623, 637 (1979), affd. without opinion (3d Cir., May 27, 1980).

was actually transferred between the parties to that agreement. Thus, we conclude that the statute of frauds is not applicable.

Moreover, it is clear from the evidence before us, which record includes the testimony of all the parties to the transaction, that an oral agreement was reached. There is no indication that, after the oral agreement was made, any steps were taken in accordance with the original sales contract. Rather, the evidence shows that the parties took steps in accordance with the oral agreement to effect an exchange. Certainly, the sales contract for the Gasconade farm and the payment by petitioners of an additional sales commission bears this out. We believe it is immaterial that the parties only orally agreed to effect an exchange, since "Tax consequences must depend on what was actually intended and accomplished." *Century Electric Co. v. Commissioner*, 192 F.2d 155, 159 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952).

Having identified those factors which we do not consider crucial, the more difficult task is to identify those factors which distinguish an exchange from a sale and immediate reinvestment.

In *Biggs v. Commissioner*, 69 T.C. 905 (1978), the Court stressed the substance rather than the form in its analysis of the transaction. The taxpayer in *Biggs* owned farmland which he agreed to sell only if he received like-kind property as part of the consideration. We quote the Court's headnote reflecting the steps taken to complete the transaction:

> T orally agreed to sell his Maryland farm to P for $900,000; as part of the consideration, T was to receive like-kind property. Subsequently, T located a Virginia farm which he wished to receive in exchange, arranged for title to the Virginia farm to be transferred to C, and advanced the necessary funds. Later, P contracted to buy the Virginia farm from C. On the follwing day, by written contract, T agreed to transfer the Maryland farm to P, and P assigned his right to purchase the Virginia farm to T. At the closing of these transactions, T conveyed his Maryland farm to P's assigns and received $100,000 in cash and an $800,000 promissory note. At the same time, C conveyed title to the Virginia farm, subject to mortgages, to T, and T assumed such mortgages. * * *

In rejecting respondent's argument in *Biggs* that contractual interdependence between taxpayer's transfer and receipt of property was a necessary requirement of an exchange, the Court stated that the transaction would qualify under section 1031 if the taxpayer's transfer and receipt of property "were interdependent parts of an overall plan, the result of which was an

exchange of like-kind properties." *Biggs v. Commissioner, supra* at 914. Thus, in holding that the particular transaction qualified under section 1031, the Court focused on the parties' intent to effect a qualifying exchange and on the fact that at the closing of the various real estate transfers petitioners conveyed title to real property and received title to real property. *Biggs v. Commissioner, supra* at 915. Qualification under section 1031 was not precluded in *Biggs* because the buyer with whom the taxpayer originally intended to exchange properties, never having had legal title, only assigned to the taxpayer a contract right to purchase the exchange property. *Biggs v. Commissioner, supra* at 915–916. Nor did it matter that the taxpayer had initially helped finance the acquisition of the property which he ultimately received. In essence, the Court looked to the substance of the transaction to determine whether taxpayer in effect conveyed title to his property in consideration for title to the property received.[7] See also *Coupe v. Commissioner, supra* at 405.

Against the background of *Biggs*, the only reasonable conclusion is that petitioners' transfer of the St. Charles farm and their receipt of the Gasconade farm qualified as an exchange of like-kind property under section 1031. It is clear that the consideration for petitioners' transfer of title to the St. Charles farm to Milor Realty was the receipt of title to the Gasconade farm and

---

[7]As noted by the Court in that case, support for its approach can be drawn from the rationale for sec. 1031. *Biggs v. Commissioner*, 69 T.C. 905, 913 (1978). As we stated in *Koch v. Commissioner*, 71 T.C. 54, 63–64 (1978):

"The basic reason for allowing nonrecognition of gain or loss on the exchange of like-kind property is that the taxpayer's economic situation after the exhange is fundamentally the same as it was before the transaction occurred. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564; *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 455–456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court on another point; *Biggs v. Commissioner*, 69 T.C. 905, 913 (1978). The rules of section 1031 apply automatically; they are not elective. Cf. *Horne v. Commissioner*, 5 T.C. 250, 256 (1945). The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment still unliquidated. *Commissioner v. P.G. Lake, Inc.*, 356 U.S. 260, 268 (1958)."

Cf. *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979). The Eighth Circuit Court of Appeals, the circuit court to which this case would normally be appealable, has also emphasized substance over form in sec. 1031 cases. See *Smith v. Commissioner*, 537 F.2d 972 (8th Cir. 1976), affg. a Memorandum Opinion of this Court; *Century Electric Co. v. Commissioner*, 192 F.2d 155 (8th Cir. 1951), affg. 15 T.C. 581 (1950), cert. denied 342 U.S. 954 (1952).

that this transfer and receipt "were interdependent parts of an overall plan." Respondent's arguments that petitioners' receipt of only a contract right from Milor Realty and their endorsement of all the checks used to equalize the various transfers do not, in light of *Biggs*, preclude section 1031 treatment when it is considered that petitioners also received a warranty deed to the Gasconade farm at the same time. Given, under *Biggs*, that substance should control, the only reasonable conclusion is that an exchange was effected.

The presence of Oney in the transactions does not alter the foregoing conclusion. Oney's role in the instant transaction was similar to that performed in *Biggs* by the corporation owned by taxpayer's attorney. *Biggs v. Commissioner, supra* at 917. Based on the record before us, it cannot be said that Oney was acting as petitioners' agent when the purchase agreement was executed for Gasconade farm. See *Coupe v. Commissioner, supra* at 406–407.

We do not believe that a result in this case grounded on *Biggs*, namely, that the instant transaction qualifies under section 1031, is undercut by the recent case of *Barker v. Commissioner*, 74 T.C. 555 (1980). In *Barker*, greater emphasis was placed on form than was the case in *Biggs* because "the conceptual distinction between an exchange qualifying for section 1031 on the one hand and a sale and reinvestment on the other is largely one of form." *Barker v. Commissioner, supra* at 566. The taxpayer in *Barker* owned certain property which a second party wanted to acquire. A third party owned like-kind property which taxpayer wanted to acquire in a nontaxable exchange. Taxpayer, the second party, and an escrow agent entered into a series of interdependent escrow agreements whereby the escrow agent agreed to (1) purchase from the third party the property which taxpayer desired to acquire, (2) exchange this property for the property owned by taxpayer, and (3) sell taxpayer's property to the second party. Pursuant to the escrow agreements, the various transfers occurred.

Although the Court held that the transaction at issue in *Barker* qualified under section 1031, it did so only after noting that the contractual arrangements between the parties were mutually interdependent parts of an integrated plan with each

transaction covered thereunder being contingent on the simultaneous and successful completion of the other transactions.[8] Furthermore, care was taken to see that the taxpayer did not obtain or control cash and that title to the various properties involved passed in accordance with the idea that an exchange was being effected.

While the transaction in the instant case was not as artfully done as that in *Barker*, we do not believe that *Barker* requires a different result than that engendered under *Biggs*. The real estate contract between Franz and Oney for sale of the Gasconade farm was "contingent on the trade of the Brauer Farm * * * with Milor." Franz's transfer of Gasconade farm to petitioners by warranty deed and the contemporaneous closing of the remaining transfers effectively resulted in an exchange by petitioners of the St. Charles farm for the Gasconade farm. The fact that petitioners did not receive title to the Gasconade farm from Milor Realty is not dispositive. *W. D. Haden Co. v. Commissioner, supra.* Furthermore, although petitioners may have endorsed all the checks used to equalize the various transfers, it is clear that they never exercised control over them since the circumstances of the closing required that the checks be endorsed to the escrow agent. Petitioners did not withhold from the endorsed checks the amount which they would receive in the transaction. It was only from the escrow agent that petitioners received this amount.

In summary, we conclude that petitioners' transfer of the St. Charles farm and their receipt of the Gasconade farm qualifies for nonrecognition treatment under section 1031. Both the substance and form of the transaction were that of a qualifying exchange.

*Decision will be entered under Rule 155.*

---

[8]The Court noted, however, in note 5, that contractual interdependence was not required as a condition to the finding that an exchange has taken place, citing *Biggs*. The Court did note that the existence of contractual interdependence supported its conclusion that a qualifying exchange had occurred.