DAVID E. AND SANDRA L. GANTNER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2222-86.         Filed September 29, 1988.

*Mark Arth,* for the petitioners.
*Genelle Forsberg* and *Douglas W. Hinds,* for the respondent.

WELLS, *Judge:* Respondent determined deficiencies in and additions to petitioners' 1980 and 1981 Federal income taxes as follows:

| Year | Deficiency | Additions to tax[1] | | | |
|------|-----------|-------------------|----------|-----------------|-----------------|
|      |           | *Sec. 6651(a)(1)* | *Sec. 6653(a)* | *Sec. 6653(a)(1)* | *Sec. 6653(a)(2)* |
| 1980 | $63,027.02 | $4,848.79 | $5,241.60 | - - - | - - - |
| 1981 | 4,433.00 | - - - | - - - | $248.10 | (1) |

[1]50 percent of the interest due on $4,433

Respondent also determined that petitioners are liable for the increased rate of interest pursuant to section 6621(c).[2]

After settlement by the parties of several issues, the following remain for our decision: (1) Whether a loss on the sale of stock options should be disallowed pursuant to the wash-sale provisions of section 1091; (2) whether deductions and investment credits relating to computer equipment are allowable; (3) whether deductions for an office in petitioners' residence are allowable; (4) whether other business expenses for 1981 are allowable; and (5) whether there was an underpayment of petitioners' 1980 income tax attributable to tax-motivated transactions so that petitioners are liable for the increased rate of interest pursuant to section 6621(c).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioners resided in Bloomington, Minnesota, when they filed their petition.

During 1980 and 1981, petitioner David E. Gantner (petitioner) was president and a shareholder of the North Star Driving School, Inc. (North Star). North Star was in the business of selling driving lessons, and it provided students with classroom instruction and behind-the-wheel training. During the years in issue, petitioner also was president of the Driving School Association of the Americas (DSAA), a trade association consisting of approximately 225 dues-paying members, but in effect representing approximately 3,300 driving schools in the United States and

[2]Subsec. (d) of sec. 6621 was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to sec. 6621 as redesignated and amended.

Canada. Petitioner's activities in DSAA required only a "token amount" of his time, including attendance at two or three meetings per year of the board of directors. Petitioner also served as a delegate to international driving instruction conventions held in Germany and Austria in 1980 and 1981, respectively.

Petitioner and Lee Whited each owned 50 percent of the stock of North Star, and each received compensation from North Star in the amounts of $37,874 and $38,369 in 1980 and 1981, respectively. Petitioner generally was responsible for the business aspects of North Star such as payroll, other disbursements, and marketing, and Mr. Whited generally was responsible for the operational aspects such as hiring, training, and supervising the driving instructors. The majority of North Star's students were of high school age, so the principal activities of the driving school took place from about 3 p.m. until the early evening hours. Petitioner usually performed his duties for North Star during the afternoon and early evening hours, as well as on weekends. Also, driving instructors sometimes would stop by petitioner's home at night to drop off receipts collected from the students and to pick up contracts that petitioner had brought to them from the North Star office.

In addition to his duties with North Star and DSAA, petitioner also devoted a substantial part of the morning and early afternoon hours on weekdays to monitoring the stock market. Those times comported with the hours during which the New York Stock Exchange and the American Stock Exchange were open—9 a.m. until 3 p.m., Minnesota time. During 1980, petitioner's stock market transactions consisted of purchases and sales of only call options for stock; he neither acquired nor sold actual shares of stock.

Petitioner was not a licensed broker, so he purchased the stock options through the Minneapolis office of the brokerage firm Shearson Loeb Rhoades, Inc. (Shearson). His account statements from Shearson reflect the following activity in 1980:

| | *Sales* | *Purchases* | | *Sales* | *Purchases* |
|---|---|---|---|---|---|
| January | 3 | 3 | May | 1 | 3 |
| March | 4 | 2 | June | 4 | 4 |
| April | 0 | 1 | July | 7 | 5 |

|  | Sales | Purchases |  | Sales | Purchases |
|---|---|---|---|---|---|
| August | 10 | 5 | November | 5 | 3 |
| September | 6 | 8 | December | 3 | 2 |
| October | 6 | 6 | Year total | 49 | 42 |

Petitioner bought 1,330 options in his 42 purchase transactions and sold 1,255 options in his 49 sales transactions. [3] In 1980, petitioner's net sales proceeds from stock options (after commissions) amounted to $1,043,978.76, and his total purchases (including commissions) amounted to $871,408.49.

Due to the high volume of his trading activity, petitioner received a 30-percent discount on commission fees from Shearson. In fact, one of the two Shearson brokers used by petitioner in 1980 described petitioner as "the most active customer I've ever had." Petitioner did not rely on brokers for recommendations to buy or sell options; he depended on the brokers only for execution of the trades and for information, e.g., the most current market prices.

The majority of petitioner's 1980 purchases and sales of call options were for stock in Tandy Corp. (Tandy). Included among petitioner's purchases were the following calls for Tandy at $100 per share, expiring in January 1981 (JAN 100s):[4]

| Date purchased | Number | Cost |
|---|---|---|
| 11/20/80 | 15 | $15,979.35 |
| 11/20/80 | 35 | 38,160.29 |
| 12/02/80 | 50 | 36,260.06 |

On December 3, 1980, petitioner bought 100 JAN 100s at a cost of $61,063 and sold 100 JAN 100s for $51,490. On his 1980 tax return, petitioner reported a loss of $38,909.70 from the sale of the Tandy options. The loss was computed using a cost basis of $90,399.70 (total cost of the purchases on November 20 and December 2) and a sales price of $51,490.

In the notice of deficiency, respondent disallowed that loss for 1980 based upon the wash-sale provisions. Respondent added the amount of the disallowed loss to the basis of the options purchased on December 3, 1980, and allowed

---

[3] The parties stipulated that petitioner both bought and sold 1255 options during 1980, but our examination of petitioner's account statements indicates that the stipulation is incorrect in regard to the number of options purchased. See *Jasionowski v. Commissioner,* 66 T.C. 312, 318 (1976).

[4] A single call represented an option to purchase 100 Tandy shares for $100 per share.

petitioner an increased 1981 loss upon the disposition and expiration of the Tandy options in January 1981.

In addition to his stock option trades, petitioner purchased and sold commodities futures through a "managed account" administered by Shearson's Chicago office. The managed account gave the broker in Chicago discretionary authority to make trades for the account without any participation by petitioner in the decisions. Petitioner's use of such a discretionary account for his commodity transactions was in direct contrast to his stock option account in which he alone made the decisions to buy or sell.

Among petitioner's commodity transactions in 1980 were straddles using gold contracts. Prior to trial, the parties entered into a closing agreement for the disallowance of short-term capital losses claimed on petitioners' 1980 tax return for "gold commodity futures tax straddles transactions" in the amount of $253,350. In September 1983, petitioners prepared an amended 1980 tax return reflecting the disallowance of those commodities transactions. The tax liability, as reflected on that amended return, was $40,329. As of the date of trial, petitioners had made the following payments to apply against their 1980 Federal tax liability:

| | |
|---|---:|
| 1980 withholding, net of amounts refunded | $1,319 |
| 11/6/84 | 500 |
| 12/31/84 | 20,000 |
| 10/17/85 | 43,929 |
| 10/21/85 | 8,199 |
| | 73,947 |

In 1979, 1980, and 1981, petitioner purchased various items of computer equipment and computer software. The computers were used by North Star for payroll, form letters and mailing lists, scheduling students and instructors, and other business purposes. Petitioner, rather than North Star, paid for the computer items because North Star was short of cash at the time. The computers also were used by petitioner to maintain information relating both to DSAA and to petitioner's stock options and commodity futures.

All but one of the computers were located in the North Star offices. One computer was kept in a room in petitioner's home and could interface with the computers at the North Star offices via a telephone modem located in the

home. The majority of petitioner's use of the computers took place while he was in the North Star office; however, he sometimes used the computers while at his home. During 1979 through 1981, North Star had no rental agreement with petitioner, and North Star made no payments to petitioner for its use of the computer items. There was no written agreement between petitioner and Mr. Whited with respect to the computer items.

On their amended 1980 tax return, petitioners claimed deductions and investment credits relating to the computer items as follows:

| | |
|---|---|
| Depreciation | $9,715.41 |
| Expenses for repairs and supplies | 1,876.41 |
| Investment credit for items purchased in 1979 and 1980 | 1,755.00 |

On their 1981 tax return, petitioners claimed deductions and investment credits for computer items as follows:

| | |
|---|---|
| Depreciation | $6,980.49 |
| Expenses for supplies and repairs | 843.36 |
| Investment credit | 225.61 |

On their 1980 and 1981 tax returns, petitioners claimed additional deductions and credits as follows:

| | *1981* | *1980* |
|---|---|---|
| Expenses of office in the home | $285.81 | $285.81 |
| Depreciation on a Honeywell security system in the home | 147.04 | - - - |
| Investment credit on the Honeywell security system | 183.87 | - - - |
| Unreimbursed expenses as DSAA president | 2,154.71 | 1,111.83 |

In the notice of deficiency, respondent disallowed all of petitioners' claimed deductions and credits relating to the computer items, the home office, the Honeywell system, and the DSAA expenses. Petitioners have conceded the nondeductibility of the DSAA expenses claimed for 1980, but they still contest the disallowance of the other items.

OPINION

*Wash Sale*

The first issue is whether the loss from petitioner's November and December trades of the Tandy calls should be disallowed for 1980 as a wash-sale pursuant to section

1091. Respondent has not suggested that any common law wash-sale doctrine should apply in the instant case. Cf. *Shoenberg v. Commissioner,* 77 F.2d 446 (8th Cir. 1935), affg. 30 B.T.A. 659 (1934); *Horne v. Commissioner,* 5 T.C. 250 (1945). See also *Cottage Savings Association v. Commissioner,* 90 T.C. 372, 392-394 (1988). Respondent's position is based solely on the applicability of section 1091 to the facts before us. As in effect in 1980, section 1091(a) provided as follows:

SEC. 1091. LOSS FROM WASH SALES OF STOCK OR SECURITIES.

(a) DISALLOWANCE OF LOSS DEDUCTION.—In the case of any loss claimed to have been sustained from any sale or other disposition of shares of stock or securities where it appears that, within a period beginning 30 days before the date of such sale or disposition and ending 30 days after such date, the taxpayer has acquired (by purchase or by an exchange on which the entire amount of gain or loss was recognized by law), or has entered into a contract or option so to acquire, substantially identical stock or securities, then no deduction for the loss shall be allowed under section 165(c)(2); nor shall such deduction be allowed a corporation under section 165(a) unless it is a dealer in stocks or securities, and the loss is sustained in a transaction made in the ordinary course of its business.

We have no doubt that petitioner's Tandy call transactions in November and December fall within the ambit of section 1091 if the Tandy options are "shares of stock or securities." Petitioner purchased 100 calls on November 20 and December 2, he sold 100 identical calls on December 3, and he purchased 100 identical calls on December 3. In short, petitioner's position at the beginning of December 3 was identical to his position at the beginning of December 4—he owned 100 Tandy JAN 100 calls—and the repurchase took place within 30 days (actually, the same day) of the disputed loss sale.

Petitioners assert, however, that the Tandy options are not "shares of stock or securities" as those terms are used in section 1091. Petitioners also assert that petitioner was in the trade or business of trading options so that the loss is allowable under section 165(c)(1), not section 165(c)(2); therefore, section 1091 does not apply to him. The arguments are disjunctive, so a finding for petitioners on either argument would cause section 1091 to be inapplicable to the loss on the Tandy options.

Respondent counters that (1) the options are securities subject to loss disallowance under section 1091; (2) petitioners' assertion that petitioner was in the trade or business of trading options was not timely and should not be considered by the Court; and (3) even if the trade or business issue was raised timely, petitioner's buying and selling of stock options did not rise to such a level that he was either a dealer or trader—petitioner was merely an investor.

Neither Code section 1091 nor the regulations thereunder contain a definition of what constitutes a "security" for purposes of section 1091.[5] In addition, the parties have not cited and we are not familiar with any case that decides whether an option is a security for such purposes; the issue before us is one of first impression. Other sections of the Code contain the term "stock or securities," but stock options are not treated uniformly in all those sections. For example, section 1236(c) defines the term "security" to include "any evidence of an interest in or right to subscribe to or purchase" stock in a corporation. On the other hand, "For purposes of section 351, stock rights or stock warrants are not included in the term 'stock or securities.'" Sec. 1.351-1(a)(1), Income Tax Regs. In short, there is no uniform rule under tax law whereby stock options definitively are included in or excluded from categorization as "stock or securities."[6] See A. Kramer, Taxation of Securities, Commodities, and Options, sec. 17.6(a), at 17-10 (1986). We therefore shall focus on the terms of section 1091, itself, to ascertain whether a stock option is a security.

By its terms, section 1091(a) requires two events before it can apply. There must be both (1) a sale or other disposition on which a loss was claimed, as well as (2) an acquisition of like property within 30 days of the date of the sale or disposition. The statute speaks in terms of the sale or disposition only of "shares of stock or securities"; however,

---

[5] Cases have held that commodity futures contracts and certificates of membership in the New York Coffee and Sugar Exchange are not securities for purposes of the predecessor provision to section 1091. See *Corn Products Refining Co. v. Commissioner,* 16 T.C. 395, 399-400 (1951), affd. 215 F.2d 513 (2d Cir. 1954), affd. on other grounds 350 U.S. 46 (1955); *Horne v. Commissioner,* 5 T.C. 250 (1945).

[6] This is in contrast to Federal securities law, which defines the term "security" specifically to include any put or call on stock. 15 U.S.C. secs. 77b(1) and 78c(a)(10) (1982). Prior to 1982, those definitions of "security" did not specifically include puts or calls, but did include a "warrant or right to subscribe to or purchase" any security. 15 U.S.C. secs. 77b(1) and 78c(a)(10) (1981). See Act of October 13, 1982, Pub. L. 97-303, 96 Stat. 1409.

the reacquisition event is described as occurring if "the taxpayer has acquired * * * , *or has entered into a contract or option so to acquire,* substantially identical stock or securities." (Emphasis supplied.) Implicit in that statutory language is that *a contract or option to acquire* stock or securities is not the same as an *acquisition of* stock or securities. To say that entry into a contract or option to acquire stock or securities is tantamount to the acquisition of stock and securities would be to render superfluous the above-emphasized clause in section 1091(a). Such an interpretation would violate the cardinal rule of statutory construction that "effect shall be given to every clause and part of a statute" (*Ginsberg & Sons v. Popkin,* 285 U.S. 204, 208 (1932); *Woods v. Commissioner,* 91 T.C. 88, 98 (1988); *McNutt-Boyce Co. v. Commissioner,* 38 T.C. 462, 469 (1962), affd. per curiam 324 F.2d 957 (5th Cir. 1963)), and we decline to read that emphasized clause out of the statute. Thus, insofar as the reacquisition event is concerned, an option to acquire stock or securities surely is not equivalent to stock or securities. Extending that logic to the disposition event, a disposition of an option to acquire stock is not equivalent to a disposition of stock of securities. Such a construction is required in order to maintain the internal consistency of the terms of section 1091, because identical words used in different parts of the same statute must be construed to mean the same thing if no contrary meaning is clearly shown. See *Sorenson v. Secretary of Treasury,* 475 U.S. 851, 860 (1986); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87 (1934); *Gellman v. United States,* 235 F.2d 87, 89 (8th Cir. 1956); *Estate of Cuddihy v. Commissioner,* 32 T.C. 1171, 1176 (1959). Thus, the plain meaning of section 1091(a) is that an option to acquire stock is not equivalent to "stock or securities" and a loss sustained from a sale or disposition of stock options is not a loss which comes within the plain meaning of section 1091.

Even though we have interpreted section 1091(a) on its face to exclude stock options from its ambit, we shall examine the history of section 1091 and its predecessor provisions to determine whether the intent of Congress is contrary to the plain meaning of the words of the statute.

See *Jaske v. Commissioner,* 823 F.2d 174, 176 (7th Cir. 1987), affg. a Memorandum Opinion of this Court; *Segel v. Commissioner,* 89 T.C. 816, 841 (1987); *Huntsberry v. Commissioner,* 83 T.C. 742, 747-748 (1984). The tax statutes have contained a provision substantially identical to section 1091 for over 60 years. The Revenue Act of 1924, ch. 234, 43 Stat. 253, 269-270, included the following provision:

### DEDUCTIONS ALLOWED INDIVIDUALS

SEC. 214. (a) That in computing net income there shall be allowed as deductions:

\*　　\*　　\*　　\*　　\*　　\*　　\*

(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business \* \* \* . No deduction shall be allowed under this paragraph for any loss claimed to have been sustained in any sale or other disposition of shares of stock or securities where it appears that within thirty days before or after the date of such sale or other disposition the taxpayer has acquired (otherwise than by bequest or inheritance) *or has entered into a contract or option to acquire* substantially identical property, and the property so acquired is held by the taxpayer for any period after such sale or other disposition. \* \* \* [Emphasis supplied.]

Except for the emphasized clause (which first appeared in the 1924 Act), section 214(a)(5) of the 1924 Act is identical to the first statutory wash-sale provision enacted by Congress—section 214(a)(5) of the Revenue Act of 1921, ch. 136, 42 Stat. 227, 240.[7] Legislative history to the 1924 Act does not address the addition into law of the emphasized clause, which was the first, and to date remains the only, reference to options in the wash-sale provisions. See H. Rept. 179, 68th Cong., 1st Sess. (1924), 1939-1 C.B. (Part 2) 168, 256; S. Rept. 398, 68th Cong. 1st Sess. (1924), 1939-1 C.B. (Part 2) 266, 282; Conf. Rept. 844, 68th Cong., 1st Sess. (1924), 1939-1 C.B. (Part 2) 300, 305-306. Furthermore, we are not aware of any subsequent legislative history that refers to options in the context of wash sales.

The Conference report for the 1921 Act, Conf. Rept. 486, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 206, 214,

---

[7]As enacted in 1921, sec. 214(a)(5) also contained a clause limiting its application to sales and dispositions made after the passage of the 1921 Act, but no such clause was included in the 1924 Act.

provides the most expansive explanation available of Congress' intent in enacting the wash-sale provisions:

The House bill provided that the taxpayer shall not be allowed any loss sustained *in any sale of shares of stock* where it appears that at or about the date of such sale the taxpayer has acquired identical property in substantially the same amount as the property sold, and that if such new acquisition is to the extent of part only of the identical property, then the amount of loss deductible shall be in proportion as the total amount of the property sold or disposed of bears to the property acquired. The Senate amendment extends the operation of the rule to cases where the acquisition of new property is within 30 days before or after the date of sale, but excepts from the operation of the rule of the House bill cases where the new property is acquired by bequest or inheritance, and brings within the operation of the rule cases where the new property is substantially identical with the property sold, and provides, in case the new acquisition is to the extent of part only of substantially identical property, in lieu of the proportion provided by the House bill, that only a proportionate part of the loss shall be disallowed. [Emphasis supplied.]

At first blush, that Conference explanation leads us to recall the comments of Judge Learned Hand:

The words * * * merely dance before my eyes in a meaningless procession * * * [and] leave in my mind only a confused sense of some vitally important, but successfully concealed, purport * * * . [O]ne cannot help wondering whether to the reader [those passages] have any significance save that the words are strung together with syntactical correctness.

See Hand, "Thomas Walter Swan," 57 Yale L.J. 167, 169 (1947). Nevertheless, it is clear from that explanation that Congress, in enacting former section 214(a)(5), certainly did not contemplate the application of that statutory provision to losses on sales of options. The Conference report spoke only in terms of losses from sales of stock, and the House and Senate reports to the 1921 Act described the wash-sale provision as applying only to "losses sustained in the sale of securities." H. Rept. 350, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 168, 177; S. Rept. 275, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 181, 191. In short, the legislative histories accompanying the 1921 and 1924 Acts offer no indication whatsoever that Congress intended the statutory wash-sale provision to disallow losses sustained on the sales of options.

Congress' failure to contemplate the application of the statutory wash-sale provision to sales of options likely is attributable to the lack of any significant market for resale of options in the 1920s, because it was not until 1973, when the Chicago Board Options Exchange began to trade in call options, that fungible stock options effectively were able to be bought and resold on public markets in the United States. See L. Loss, Fundamentals of Securities Regulation 252 (1983); H. Johnson, "Is It Better To Go Naked on the Street? A Primer on the Options Market," 55 Notre Dame Law. 7, 10-11 (1979). The fact that there was no ready resale market for stock options in 1921 and 1924 would explain why Congress did not then contemplate stock options being "stock or securities" for purposes of section 1091.

Moreover, Congress apparently has been aware of the growth of the options markets, as evidenced by its 1982 amendment of the 1933 and 1934 Securities Acts so as to include put and call options specifically within the definition of a "security" for purposes of those two acts. See note 6, *supra.* In spite of that apparent awareness, however, Congress has not seen fit to bring losses on options specifically within the ambit of section 1091. In 1982, or at any other time for that matter, Congress could have amended section 1091 just as it amended 15 U.S.C. sections 77b(1) and 78c(a)(10), namely, define the term "security" so as specifically to include put and call options. In short, the facts that (1) there is no legislative history to indicate that Congress ever has intended stock options to be "securities" within the meaning of section 1091, (2) there was no significant market for the resale of options when Congress first passed a statutory wash-sale provision in the 1920s, and (3) Congress has not amended section 1091 so as to include stock options specifically within the purview of that statute, when taken together, lead us to conclude that Congress has never intended for losses on sales of stock options to be subject to disallowance under the statutory wash-sale provision of 1091. That lack of legislative intent, together with our reading of the plain meaning of section 1091, requires a holding that section 1091(a) does not apply

to disallow losses sustained on the sales of stock options.[8] We therefore hold for petitioners on this issue.[9] On account of such a holding, we need not reach the alternative issue of whether petitioner was engaged in the trade or business of trading options.

### Computer Equipment

We next must decide whether, and to what extent, deductions and investment credits are allowed for the computer items. Petitioners have the burden of proof. Rule 142(a). It is evident that the majority of the use of the computers was dedicated to North Star. Furthermore, during the years at issue, there is no question but that North Star was a corporation engaged in substantial business activities whose existence cannot be disregarded. See *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436, 438-439 (1943); *Rink v. Commissioner*, 51 T.C. 746, 752 (1969).

In order to be deductible, business expenses generally must be the expenses of the taxpayer claiming the deduction. *Hewett v. Commissioner*, 47 T.C. 483, 488 (1967). In that regard, a corporation is treated as a separate entity from its shareholders for tax purposes. *Moline Properties v. Commissioner, supra*. It is also well established that a shareholder is not entitled to a deduction from his individual income for his payment of corporate expenses. *Deputy v. du Pont*, 308 U.S. 488, 494 (1940); *Rink v. Commissioner*, 51 T.C. at 751. Such payments constitute either capital contributions or loans to the corporation and are deductible, if at all, only by the corporation. *Deputy v. du Pont, supra; Rink v. Commissioner, supra*.

---

[8]Such a holding comports with "the rule frequently stated by the Supreme Court that 'taxing acts are not to be extended by implication beyond the clear impact of the language used' and that 'doubts are to be resolved against the government and in favor of the taxpayer.' *Helvering v. Stockholms Enskilda Bank*, 293 U.S. 84, 93-94 (1934)." *Larotonda v. Commissioner*, 89 T.C. 287, 292 (1987). See also *United States v. Merriam*, 263 U.S. 179, 187-188 (1923); *Gellman v. United States*, 235 F.2d 87, 90 (8th Cir. 1956); *Frankel v. United States*, 192 F. Supp. 776, 777 (D. Minn. 1961), affd. 302 F.2d 666 (8th Cir. 1962); *Chicago, St. Paul, Minneapolis & Omaha Ry. Co. v. Kelm*, 104 F. Supp. 745, 747 (D. Minn. 1952), affd. 206 F.2d 831 (8th Cir. 1953).

[9]As we noted above, respondent has not suggested that any common law wash-sale doctrine should apply to the instant case, and we take that as a concession by respondent that petitioner's loss is allowable if the provisions of sec. 1091 do not apply.

Petitioners cite *Lockwood v. Commissioner*, T.C. Memo. 1970-141, as support for their deduction of the expenses attributable to North Star's use of the computer items. Petitioners, however, misconstrue the facts of *Lockwood*. In *Lockwood*, a taxpayer was an officer of Momex, Inc., but not a shareholder in that corporation. That taxpayer's wife, however, was a 25-percent shareholder in Momex, but not an employee thereof. The shareholders and officers of Momex agreed that the officers would pay out of their own pocket, without corporate reimbursement, certain travel and entertainment expenses incurred by them on behalf of Momex. The corporate officer was accompanied by his wife on certain trips for Momex, and the couple claimed deductions for the expenses of those trips. We held that the taxpayers were allowed a deduction for the portion of the expenditures attributable to the husband on the grounds that those were ordinary and necessary expenses of being a Momex officer. We disallowed deductions for the wife's expenses because she was an investor, not an employee of Momex, and she did not show that the expenses were ordinary and necessary expenses of managing or conserving her Momex stock. *Lockwood* does not support petitioners' position because the taxpayer in *Lockwood* who was allowed a deduction was not a shareholder in his employer corporation; there was no issue in *Lockwood* as to whether the allowed expenses might have been capital contributions. *Lockwood* thus is inapposite to the facts of the instant case.

Petitioners cite no other authority to support their deductions of the computer items used by North Star. Petitioners have not suggested how the computer expenses possibly might be deductible expenses related to petitioner's role as an employee of North Star. Cf. *Gould v. Commissioner*, 64 T.C. 132, 135 (1975). There was no corporate resolution or requirement that petitioner, as an employee, incur those expenses. Indeed, it appears to us that petitioner purchased the computer items in his capacity as a shareholder who desired that the company become more profitable, and the stock therefore more valuable. See *Koree v. Commissioner*, 40 T.C. 961, 965-966 (1963).[10] Such

---

[10]See also *Cedrone v. Commissioner*, T.C. Memo. 1986-89.

payments are contributions to the capital of North Star and, if at all deductible, are deductible by North Star, not by petitioners.

Petitioner testified that the computers also were used to keep mailing lists for DSAA, as well as to keep track of his options and commodities futures. Petitioners have not offered a log or any other evidence to show what percentage of use of the computers was devoted to North Star and what was devoted to his other activities. We, however, believe petitioner's testimony that he used the computers for activities other than North Star. Therefore, bearing heavily upon petitioners, whose inexactitude is of their own making, we find that they are entitled to a deduction and investment credits for 5 percent of the use of the computers.[11] *Cohan v. Commissioner*, 39 F.2d 540, 544 (2d Cir. 1930); *Browne v. Commissioner*, 73 T.C. 723, 729 (1980).

The parties disagree about the total amount of computer expenses incurred by petitioner during the years at issue. Respondent concedes that petitioner paid for depreciable computer items in the amounts of $3,382.95, $21,958.95, and $2,256.10 in 1979, 1980, and 1981, respectively. On their tax returns, petitioners used a higher cost basis for depreciation of those items; however, since petitioners have offered no evidence to support the higher bases, we deem them to have conceded the amounts in excess of those stipulated by respondent. Petitioners claimed depreciation and investment credit for the items purchased in 1979 as attributable to items first put into service in 1980. Respondent has not questioned the timing of the computer deduction and credit, and we deem him to have conceded that the 1979 and 1980 expenses relate to property placed in service in 1980.

Petitioners have not offered evidence to substantiate any of the expenses for computer supplies and repairs claimed for 1980 and 1981. Respondent, however, has stipulated that petitioner incurred expenses for repairs and supplies in 1981 in the amount of $843.36 Petitioners therefore are

---

[11]For purposes of this deduction and credit, it is immaterial whether petitioner's trading of options rose to the level of a trade or business. If he were in a trade or business, the computer expenses would be deductible under sec. 162. If he were merely an investor, the expenses would be deductible under sec. 212. Investment credit similarly would be allowable in either event. Secs. 48(a)(1), 168(c)(1).

entitled to a deduction for 5 percent of those expenses, but have not shown their entitlement to any such expenses for 1980. Rule 142(a).

Last, respondent asserts that petitioner's computer purchases included software in the amounts of $397.95 and $2,256.10 for 1980 and 1981, respectively. Petitioners have not disputed those assertions, and we find that purchases in those amounts were for software. Rule 142(a). Investment credit is not allowed on computer software, so those amounts must be excluded from the basis of the section 38 property on which investment credit is available. *Ronnen v. Commissioner*, 90 T.C. 74, 96-100 1988).

In summary, we have found that petitioners are entitled to take deductions and credits for computer items to the extent of 5 percent of the following:

| | | |
|---|---|---|
| Depreciable basis—placed in service | 1980 | $25,341.90 |
| | 1981 | 2,256.10 |
| Basis of section 38 property | 1980 | 24,943.95 |
| Expenses of supplies and repairs | 1981 | 843.36 |

Petitioners also claimed investment credit and depreciation for a security system installed in their home in 1981. Their briefs do not address the use or purpose of the system, and they have forwarded no evidence to substantiate any deductions or credits for costs of the system. We therefore deem them to have conceded the deductions and credit relating to the security system. Rule 142(a).

## Home Office

Next, petitioners contend that they are entitled to a deduction for use of a room in their home as an office. Petitioners have the burden of proof on this matter. Rule 142(a). Section 280A(a) provides that no deduction shall be allowed with respect to the use of a dwelling unit which is used by a taxpayer as his residence. Section 280A(c)(1) provides exceptions under which a deduction is allowed to the extent a portion of the home is used on a regular basis exclusively as (1) the principal place of business for any trade or business of the taxpayer,[12] or (2) a place of

---

[12]For certain pre-1980 tax years, this first exception was worded so that a deduction was available for the use of a portion of the home "as the taxpayer's principal place of business."

business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of business. In the case of an employee, however, those exceptions apply only if the exclusive use of the portion of the residence is for the convenience of the employer. Sec. 280A(c)(1).

Petitioners rely on *Heineman v. Commissioner*, 82 T.C. 538 (1984), to support the home office deduction. Petitioners apparently overlook the first sentence of the opinion portion of that case, where we stated that "section 280A, relating to the use of a home as an office, is not applicable in this case because [the parties] agreed that the office was not a dwelling unit which was used as a residence within the meaning of section 280A(a)." 84 T.C. at 542. *Heineman* is thus inapposite to the instant case because there is no doubt that the house in which petitioner's "office" was located was used as petitioners' residence.

Petitioners contend that it was necessary for petitioner to have a home office so that he could meet with driving instructors at night, and so that he could perform payroll functions and other duties for North Star. Petitioner maintains that he performed his North Star duties at his home because the North Star office was too noisy and he could not concentrate while there. As asserted in petitioners' brief, "The Petitioner requires solitude when conducting those affairs."

Petitioners' brief states that the office in the home was used "exclusively as an office to perform duties required of [petitioner] by North Star." Petitioners' brief[13] does not suggest that the office was used as the principal place of business of petitioner's trading of stock options (assuming arguendo that the options activities were a trade or business), and we take the failure to assert such as a concession that petitioner did not use his home as the focal point of his stock option activities. Indeed, petitioner testified that he would be at the North Star office during most of the time the stock market was open and would keep in contact with the brokers from there. He also testified

The change in the wording of sec. 280A(c)(1)(A) was made by an Act of December 29, 1981, Pub. L. 97-119, sec. 113, 95 Stat. 1635.

[13]Petitioners' reply brief was devoted solely to arguments regarding the options/wash-sale issue and did not address any other issues.

that in regard to the charting and recordkeeping of his option and commodity transactions, "I would normally do it at the office after the market closed. * * * I didn't really do much at home. I'd read the paper and try to get some information from there." In short, petitioners have based their entitlement to a home office deduction solely on the activities petitioner performed for North Star at home.

Petitioners have failed to prove that petitioner's use of an office in his home was "for the convenience of his employer," as required by section 280A(a)(1). North Star provided petitioner with working space at its office. Indeed, petitioner, a 50-percent shareholder and the president of North Star, likely could use as much of the North Star office space as he required; there is no indication that the terms of petitioner's employment with North Star required him to maintain a home office. His meetings with the driving instructors were more for the convenience of those employees than of North Star; the fact that petitioner lived in Bloomington, in the southwest outskirts of the metropolitan area, allowed the instructors in the southwest quadrant to avoid having to drive across town to the North Star offices in St. Paul. Furthermore, there is no indication why petitioner should require an office to meet with the instructors.

We understand why petitioner might prefer the quietude of his home to the bustle of the North Star office; however, we think that his use of a home office to perform his other North Star duties was more for his convenience than for that of North Star. Even though the use of petitioner's home office was helpful and possibly appropriate in connection with his employment, Congress specifically intended to negate such a standard of allowability with its enactment of section 280A. H. Rept. 94-658, 1976-3 C.B. (Vol. 2) 695, 853; S. Rept. 94-938, 1976-3 C.B. (Vol. 3) 49, 186-187.[14] In short, we find that petitioners have not shown their entitlement to any home office deductions under section 280A.

## DSAA Expenses

Petitioners next contend that they are entitled to a deduction in 1981 for unreimbursed expenses related to

---

[14]See *Dudley v. Commissioner,* T.C. Memo. 1987-607.

petitioner's duties as president of DSAA. On their 1981 tax return, petitioners claimed total expenses relating to DSAA of $3,418.63 and reimbursement of $1,263.92, for a net deduction of $2,154.71. The parties have stipulated that petitioner has checks written in 1981 in the total amount of $1,992.64. Petitioners' only contentions on this issue are that those checks adequately substantiate the 1981 deduction and that "the revenue agent's demand for unobtainable invoices was beyond the requirements of section 162 and the items were not related to section 274."

The only explanation in the record as to the composition of the claimed expenses was the following statement on petitioners' 1981 tax return: "Taxpayer is president of a National Business Association and was required to attend International Convention in Vienna in June 1981." Section 274(d) provides that no deduction shall be allowed for any traveling expense unless the taxpayer substantiates by adequate records or other sufficient evidence the amount of the expenditure, the time and place of the activity, and the business purpose. Section 274 obviously applies to at least some of the 1981 expenses. Petitioners have offered no records or other evidence to substantiate the business purpose of the stipulated checks, and they have not suggested which, if any, of the payments were for activities which are not subject to section 274. We therefore find that petitioners fail to meet their burden to prove their entitlement to any of those claimed expenses. Rule 142(a).

## Section 6621(c)

Section 6621(c) provides for increased interest where there is an underpayment of taxes in excess of $1,000 attributable to tax-motivated transactions in any year. Section 6621(c) applies only with respect to interest accruing after December 31, 1984, even though the taxpayer entered into the tax-motivated transactions before the date of the enactment of section 6621(c). *Cherin v. Commissioner*, 89 T.C. 986, 1000 (1987); *Solowiejczyk v. Commissioner*, 85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986).

Respondent has determined increased interest pursuant to section 6621(c) with respect to the portion of petitioners'

1980 tax liability attributable to the "gold commodity futures tax straddles transactions" which were the subject of the parties' closing agreement. Petitioners apparently do not dispute that the disallowed losses from the "gold commodity futures tax straddles transactions" are attributable to straddles as contemplated in section 6621(c)(3)(A)(iii); thus, the underpayment attributable to those transactions is attributable to tax-motivated transactions within the meaning of section 6621(c).

Petitioners' opposition to the imposition of the increased interest is based on their contention that they gave respondent's revenue agent an amended 1980 tax return reflecting that closing agreement, but that the revenue agent did not file the return. Petitioners reason as follows:

Had the return been filed and an amount assessed against the Petitioner all payments could have been made before the effective date of the 1984 amendment to section 6621. Equity demands that the IRS agent's failure to file the amended return or process the item as an agreed adjustment, which resulted in the accruing of interest under section 6621, should excuse the Petitioner from paying a higher rate of interest than that normally charged.

Petitioners' arguments do not seem to appreciate the purview of section 6621(c). It does not apply only to interest on *assessments* after December 31, 1984. Section 6621(c) applies to any interest *accruing* after that date. Interest on the underpayment attributable to petitioner's 1980 gold straddles accrues from April 15, 1981, the due date for the payment of petitioners' 1980 taxes, until such time as the taxes are paid. Secs. 6072(a), 6151(a), 6601. Thus, any act of the revenue agent in filing or not filing petitioners' amended 1980 return would have had no effect on the accrual of interest. The only act which could stop the accrual of interest on the underpayment attributable to the straddles was petitioners' payment of the taxes by December 31, 1984. See Q and A-11, sec. 301.6621-2T, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984).

Petitioners made some payments of taxes attributable to their 1980 year before the end of 1984, but they did not make sufficient payments to satisfy the entire liability for the 1980 tax year. In fact, it was not until October 1985 that they made payments sufficient to satisfy the tax

liability, without regard to interest and additions to tax, as reflected on the amended 1980 return. Pursuant to Q and A-11 of section 301.6621-2T, Temporary Proced. & Admin. Regs., respondent applied the payments first to reduce the portion of the underpayment not attributable to the straddles. Petitioners have not challenged the validity of those temporary regulations, and we take that as a concession of the validity of the regulations as to them. Thus, since petitioners did not pay the total underpayment attributable to the straddles by December 31, 1984, we find that they are liable for increased interest pursuant to section 6621(c) on the portion of the underpayment attributable to the straddles that remained unpaid after that date.[15]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

[15]Our holdings thus render moot petitioners' motion to amend petition (embodying amendment) and motion to submit testimony to confront testimony previously ordered stricken from record but nevertheless cited in respondent's briefs.