THOMAS A. SAFSTROM AND LANA G. SAFSTROM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Safstrom v. Commissioner
Docket No. 7172-90
United States Tax Court
T.C. Memo 1992-587; 1992 Tax Ct. Memo LEXIS 605; 64 T.C.M. (CCH) 971; September 30, 1992, Filed *605 Held: As between petitioners and their wholly owned corporation, corporation is entitled to sec. 174, I.R.C., deduction for research and experimental expenditures and sec. 44F, I.R.C., credit for increasing research activities since research activities of corporation were not undertaken on behalf of petitioner husband. For Petitioners: Neil G. Kenduck, Jeffrey B. Harris, and Andrew A. Talley. For Respondent: Jeri Gartside and Carolyn Arnold. HALPERN
HALPERN
MEMORANDUM FINDINGS OF FACT AND OPINION HALPERN, Judge: By notice of deficiency dated October 17, 1988, respondent determined deficiencies in petitioners' income taxes for 1982 and 1983 in the amounts of $ 62,727 and $ 17,158, respectively. Among the adjustments giving rise to respondent's determination of deficiencies were her disallowance of: (1) A deduction claimed for 1982 with regard to research and experimental expenditures and (2) credits claimed for 1982 and 1983 with regard to increasing research activities. At the beginning of the trial in this case, for reasons of economy, the Court ordered a separate trial with regard to the issue of whether, as between petitioners and their wholly owned corporation, Superior *606 Injection Molding, Inc. (SIMI), petitioners were entitled to claim on their returns such deduction and credits. See Rule 141(b). The trial proceeded on that issue. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts filed by the parties and attached exhibits are incorporated herein by this reference. Petitioners are husband and wife and resided in Orange, California, at the time they filed their petition in this case. When used in the singular, the term "petitioner" refers to petitioner husband, Thomas Safstrom. Petitioners owned 100 percent of the issued and outstanding shares of stock of SIMI during 1981, 1982, and 1983. Petitioner was president of SIMI during those years. SIMI manufactures plastic bottles and other containers used by companies that sell lotions, soaps, and foods. SIMI manufactures such bottles through a process called blow molding, which involves the injection of air into molten plastic to transform the plastic *607 into a particular bottle design. SIMI also manufactures molds and tools used in the blow molding process. In May 1981, petitioner determined that SIMI's production could be enhanced by acquiring a new blow molding machine (BMM). Believing SIMI capable of designing and building a more efficient BMM than those otherwise available, petitioner and SIMI's engineers began preliminary design drawings for two prototype BMM's. By November 1981, SIMI's engineers had completed several preliminary drawings and petitioner decided that SIMI would pursue the project more seriously; SIMI continued its design efforts. Two prototype BMM's were built and became operational in October and November 1982, respectively. Prior to the close of its taxable year ended October 31, 1981, SIMI incurred design expenses of approximately $ 23,400 in connection with its BMM project. SIMI deducted that amount for Federal income tax purposes. For SIMI's taxable year ended October 31, 1982, the expenses of constructing the two prototype BMM's, including materials, labor, and overhead were charged to an account in the books and records of SIMI entitled "Independent Research and Design". The total cost incurred *608 by SIMI during its 1982 taxable year to construct the prototype was $ 135,303.07. On October 31, 1982, an entry was made in SIMI's books and records transferring the sum of $ 135,303 from the account entitled "Independent Research and Design" to an account entitled "Officer's Loan Receivable". That transfer was made by SIMI pursuant to an agreement claimed by petitioners to have been entered into between petitioner, in his individual capacity, and SIMI, in October 1981. Petitioner was to pay for SIMI's continued development of the two prototype BMM's in consideration for petitioner's owning the product of such development. Petitioner was to reimburse SIMI for its labor, materials, and overhead costs incurred in connection with development of the two prototype BMM's. Petitioner was to reimburse SIMI at the conclusion of the development period for the two prototypes. No written agreements memorialize any of those arrangements. For an approximate 1-year period beginning in October 1982, the prototype BMM's were subject to final development and testing by SIMI. In September 1983, petitioners, in their individual capacities, and petitioner, as president of SIMI, entered into an *609 agreement styled "LEASE", under which SIMI purported to lease from petitioner the two prototype BMM's for a 3-year period, at a monthly rental of $ 1,259.50. Prior to entering into that agreement, petitioners did not attempt to sell or lease the prototypes to any other party. In November 1983, petitioners, as trustors, entered into a written agreement with themselves, as trustees, to establish an irrevocable trust (the 1983 Trust) for the benefit of their two children. As trustors, they purported to transfer the two prototype BMM's to the 1983 Trust. During 1988 and 1989, SIMI, as debtor, was involved in bankruptcy proceedings pursuant to title 11 of the United States Code. A plan of bankruptcy reorganization proposed by SIMI was accepted by SIMI's creditors and confirmed by the bankruptcy court in November 1989. A condition of that plan of reorganization was that the two prototype BMM's be part of the bankruptcy estate. That condition was satisfied. Sometime between 1984 and 1987, SIMI, on its own behalf and for its own use, constructed four BMM's. Those BMM's were based on the prototype BMM's. Petitioners timely filed their (calendar year) 1982 Federal income tax return, *610 claiming a deduction for research and development in the amount of $ 135,303 and a credit for research in the amount of $ 1,806. On Schedule C (on which petitioners claimed the deduction for research and development), petitioners described the main business of such activity as research and development and their product as prototype machinery. Respondent commenced her examination of petitioner's 1982 return by notifying petitioners in a letter dated May 26, 1983, that respondent wished to examine, among other items, petitioners' deduction for research and development and credit for increasing research activity. In their Federal income tax return for 1983, petitioners claimed $ 15,107 as a carryover of the unused research credit from 1982. No rental income from SIMI is shown on that return. For its taxable year ending September 30, 1981, SIMI reported taxable income of $ 21,995, claiming a deduction for research and development of $ 39,096. For its (short) taxable year ending October 31, 1981, SIMI reported taxable income of $ 1,040 and claimed no deduction for research and development expenditures. For its taxable year ending October 31, 1982, SIMI reported a loss of $ 68,343, *611 claiming a deduction for research and development of $ 666. For its taxable year ending October 31, 1983, SIMI reported taxable income of $ 182,390, claiming a deduction for research and development of $ 47,147. SIMI's financial statements for its annual accounting period ending October 31, 1982, do not show any income from the research and development agreement purportedly entered into between petitioner and SIMI regarding development of the two prototype BMM's. The same is true with regard to SIMI's financial statements for its annual accounting period ending October 31, 1983. Such 1983 statements do show a rental expense with regard to the claimed lease of the two prototype BMM's, purportedly entered into in September 1983. Petitioners' statement of assets and liabilities as of November 30, 1982, does show, as an asset, an investment in "blow mold machines", with a cost of $ 135,303. Petitioners' tax return for 1983, however, shows no rental income from the lease of such machines to SIMI. OPINION During its taxable year ended October 31, 1982, petitioners' wholly owned corporation, SIMI, incurred costs of $ 135,303.07 to construct two BMM's. The sole question for our decision *612 is whether, as between petitioners and SIMI, petitioners are the correct party to claim any available deduction under section 174 or credit under section 44F resulting from such construction. The answer to that question depends on whether, in undertaking such construction, SIMI was acting on petitioners' behalf, under a contract entered into with petitioner. We find that such construction was not undertaken on behalf of petitioners under a contract to do so. Although petitioner did agree to reimburse SIMI for its costs of constructing the two prototype BMM's, petitioners have not demonstrated that petitioner did so in consideration of obtaining ownership of such prototypes and any related technology rather than as an investment in a corporation wholly owned by him and his wife. Section 174
Section 174(a)(1) provides, as a general rule, that a taxpayer may elect to "treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account." Expenditures so treated are allowed as a deduction. Sec. 174(a)(1). Section 1.174-2(a)(2), Income Tax Regs., *613 provides that the provisions of section 174(a)(1) "apply not only to costs paid or incurred by the taxpayer for research or experimentation undertaken directly by him but also to expenditures paid or incurred for research or experimentation carried on in his behalf by another person or organization (such as a research institute, foundation, engineering company, or similar contractor)." (Emphasis added.) The question here is whether, in constructing the two prototype BMM's, SIMI acted on behalf of petitioner. That would be the case if, for instance, SIMI constructed the prototypes for petitioner under a contract with him to do so, as petitioners argue. The evidence, however, is ambiguous, and we conclude that, even though petitioner agreed to bear the costs of construction of the prototype, he did so not in consideration of receiving (directly) the product of such construction but in his role as (with his wife) sole shareholder of SIMI. A shareholder cannot convert a business expense of his corporation into a business expense of his own simply by agreeing to bear such an expense. Gantner v. Commissioner, 905 F.2d 241, 244 (8th Cir. 1990), *614 affg. 92 T.C. 192 (1989) and 91 T.C. 713 (1988). More particularly, section 174 does not permit a deduction for a contribution to capital. Reinke v. Commissioner, T.C. Memo. 1981-120 (research carried on not on behalf of shareholders but on behalf of corporation; funds transferred to corporation were contributions to capital); see Berg v. Commissioner, T.C. Memo. 1989-252. As an initial matter, we have no doubt that petitioner agreed to bear the costs of construction (after initial design development) of the two prototype BMM's. By the end of October 1981, SIMI had incurred approximately $ 23,400 of preliminary design expenses in connection with its prototype project. Robert Redwitz, who was petitioners' and SIMI's accountant, testified that, at about that time, he (Redwitz) advised petitioner that SIMI should not incur any further expense for development of the BMM technology because of the financial risk to the company. Although BMM's were important to SIMI, there was no assurance that further development would pay off. Mr. Redwitz recommended to petitioner *615 that he fund further development of the BMM technology. Petitioner testified, and we believe, that he agreed to do so. He testified that he agreed to reimburse SIMI for "labor, material, and overhead" incurred in connection with further development of the prototype BMM's. Petitioner further testified, however, that such further development of the BMM technology was to be carried on in his behalf and that he was to own the prototype BMM's constructed by SIMI. For the reasons that follow, we conclude that such technology was not developed on behalf of petitioner and that he did not acquire ownership of the two prototypes BMM's. Through October 1981, petitioner, as an employee of SIMI, and other employees of SIMI had expended considerable effort in preliminary design work on two prototype BMM's. Petitioner testified that he did not enter into any license or other agreement to acquire the fruits of that work from SIMI. Petitioner admitted that he never paid SIMI for such preliminary design work but that, nevertheless, it became incorporated into the prototype BMM's constructed by SIMI. Petitioner and SIMI's failures to address and account for the product of SIMI's preliminary design *616 work establish a shaky foundation for petitioner's claim that, in consideration for his promise to provide additional funding, he was to obtain ownership of the two prototype BMM's and the technical knowledge developed in their construction. Without owning or otherwise having the right to use the preliminary design work, it is unlikely that petitioner could have been in a position to contract with SIMI for further development of that design work and the construction of the prototype BMM's. By way of analogy, consider what petitioner's difficulty would have been had he attempted to contract, at arm's length, with some third party for the work he alleges SIMI agreed to perform. Without the preliminary design work, it is impossible to imagine a contract for the incremental work that petitioner alleges he entered into a contract for with SIMI. Thus, given the lack of attention to ownership of the preliminary design work, petitioner's story is implausible. Petitioner testified that he negotiated with himself when he negotiated with SIMI concerning the BMM technology. The resulting contract, he stated, was not committed to writing. Neither of those facts precludes a bona fide *617 contractual relationship. Nevertheless, petitioner's failure to provide us with any details of the resulting contract (beyond general statements that SIMI would do the work and petitioner would pay for it) makes us doubtful that, indeed, petitioner did negotiate his entitlement to the two prototype BMM's and related technology. Petitioners claimed a deduction in the amount of $ 135,303 in their 1982 return on account of research expenditures made to SIMI. Nevertheless, in examining SIMI's financial statements for its annual accounting period ending October 31, 1982, we cannot find any income from a research and development contract with petitioner. Nor do we find any such income reflected on SIMI's financial statements for its annual accounting period ending October 31, 1983. Petitioners have not explained that inconsistency, which inconsistency leads us to doubt that the contract with SIMI, as petitioners describe it, actually existed. An important part of the transaction between petitioner and SIMI is the alleged lease of the two prototype BMM's following their completion and testing. Moreover, there is a document styled "LEASE", under which SIMI purported to lease from petitioners *618 the two prototype BMM's. That lease, however, was entered into in September 1983, approximately 3 months after respondent commenced her examination of petitioners' 1982 return and raised questions with regard to the deduction and credit in issue. Because of that timing, we are somewhat suspicious of that lease. Under the lease, rent is due monthly, in advance. Nevertheless, petitioners' 1983 return fails to show any rental income from a lease to SIMI. SIMI's financial statements for its annual accounting period ending October 31, 1983, show a rental expense for such lease. Thus, we find the lease situation to be ambiguous and do not believe that it supports petitioners' argument. In November 1983, petitioners allegedly conveyed their interest in the two prototype BMM's to the 1983 Trust, for the benefit of their children. Petitioners cite that alleged conveyance as evidence that they owned the BMM's. Nevertheless, a condition of approval of SIMI's 1989 plan of bankruptcy reorganization was that the prototypes be part of the bankruptcy estate. We are unable to conclude that such condition was not imposed because SIMI, indeed, was the owner of such BMM's. Other factors *619 are inconsistent with petitioners' contention that petitioner agreed to pay the future costs of developing the prototype BMM's in consideration of obtaining ownership of such prototypes and the related technology. Beginning in October 1982, the prototypes were subject to a 1-year period of final development and testing by SIMI. Petitioner testified that during such period numerous modifications were made to the prototypes. Nevertheless, it does not appear that petitioner reimbursed SIMI for any prototype-related costs incurred after October 1982. [1] Moreover, during the testing period, the prototypes were not under lease to SIMI. We conclude that SIMI's management undertook modification of the prototypes because it believed that SIMI owned them. Between 1984 and 1987, SIMI, on its own behalf and for its own use, constructed four BMM's, based on the prototype BMM's. There was no testimony that petitioner licensed or otherwise made available to SIMI the technology resulting from the development of the prototype BMM's (other than by way of the lease). We assume that there was no such technology agreement, and that the lease did not provide for any independent technology transfer. *620 It is thus unclear how SIMI obtained the right to incorporate such technology into the BMM's it built unless, all along, it owned such technology. That, of course, would be inconsistent with petitioners' view of events. For its taxable year ending September 30, 1981, SIMI reported taxable income of $ 21,995, claiming a deduction for research and development of $ 39,096. For its taxable year ending October 31, 1982, SIMI reported a loss of $ 68,343, claiming a deduction for research and development of $ 666. [2] For its taxable year ending October 31, 1983, SIMI reported taxable income of $ 182,390, claiming a deduction for research and development of $ 47,147. The coincidence is not lost on us that petitioners' section 174 deduction, for 1982, makes effective use of a deduction that might have been viewed as having a reduced value for SIMI. Petitioners did not claim any deduction for research and development in their 1983 *621 return although, as set forth above, final development and testing of the prototypes continued. Based on the record as a whole, and taking into account in particular the factors above discussed, we cannot conclude that petitioner obtained ownership of the two prototype BMM's and related technology in consideration of his agreement to fund SIMI's development and construction costs with regard to such prototypes incurred after October 1981. Such development and construction was not undertaken on behalf of petitioner under a contract to do so. Rather, SIMI undertook such development and construction on its own account, with petitioner (along with his wife) as sole shareholder agreeing to contribute the capital to fund such activity. For that reason, as between petitioners and SIMI, petitioners are not entitled to any deduction available under section 174. See Berg v. Commissioner, T.C. Memo. 1989-252; Reinke v. Commissioner, T.C. Memo. 1981-120. Section 44F
*622 Our conclusion that, as between petitioners and SIMI, petitioners are not entitled to the deduction provided for in section 174 for research and experimental expenditures applies likewise to the credit claimed by petitioners pursuant to section 44F for increasing research activities. Section 44F(a) allows a credit based on the taxpayer's "qualified research expenses" for the taxable year. Section 44F(b)(1)(B) includes as qualified research expenses both "in-house research expenses" and "contract research expenses". Clearly, as to petitioner, the expenses in question would not qualify as in-house research expenses. See sec. 44F(b)(2). Section 44F(b)(3)(A) defines contract research expenses as "any amount paid or incurred by the taxpayer to any person (other than an employee of the taxpayer) for qualified research." Section 1.41-2(e), Income Tax Regs., makes clear that the qualified research must be performed "on behalf of" the taxpayer and that for it to be so performed the taxpayer must have a right to the research results. Sec. 1.41-2(e)(1), (3), Income Tax Regs.[3] Our conclusion above is that the development and construction in question was performed by SIMI on its own behalf *623 and not on behalf of petitioner. That conclusion is equally applicable here. Petitioner has not established his rights to the research results. An appropriate order will be issued. Footnotes
1. Petitioners did not claim any sec. 174↩ deduction on their 1983 Federal income tax return.
2. For its (short) taxable year ending Oct. 31, 1981, SIMI reported taxable income of $ 1,040 and claimed no deduction for research and development expenditures.↩
3. Sec. 44F was redesignated as sec. 30 by sec. 471(c) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 826. Sec. 30, in turn, was amended and redesignated as sec. 41 by sec. 231(d) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2178-2179. Sec. 1.41-2, Income Tax Regs.↩, is the pertinent regulation.