T.C. Memo. 1995-487

UNITED STATES TAX COURT

JACK R. PREWITT AND SHELLEY PREWITT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 3665-92.          Filed October 10, 1995.

Jack R. Prewitt and Shelley Prewitt, pro sese.

<u>Howard P. Levine</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in and
additions to Federal income tax for petitioners' 1980 through
1983 taxable years as follows:

| | | Additions to Tax | | | |
| Year | Deficiency | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
|------|-----------|-----------|--------------|--------------|-------|
| 1980 | $5,393 | $3,745.50 | --- | --- | --- |
| 1981 | 3,235 | 1,617.50 | --- | --- | --- |
| 1982 | 10,622 | --- | $6,879.50 | [1] | $2,655.50 |
| 1983 | 91,531 | --- | 45,765.50 | [1] | 22,882.75 |

[1] 50 percent of the interest due on the deficiency.

The 1980 through 1982 deficiencies are attributable solely to respondent's determination that no investment tax or business energy credits are allowable for the 1983 year, and hence, none are available to carry back to 1980 through 1982.  The issues remaining for our consideration are:  (1) Whether petitioners are entitled to deduct various expenses paid by checks drawn on the account of petitioner's S corporation; (2) whether $90,000 of income received by petitioner in 1982 was repaid to a related corporation during 1983, and if any amount was repaid, whether it results in a deduction for petitioners; (3) whether petitioners are liable for additions to tax for fraud under section 6653(b);[1] and (4) whether the periods for assessment of income taxes had expired before the notice of deficiency was issued.

## FINDINGS OF FACT[2]

Petitioners resided in St. Petersburg, Florida, at the time their petition was filed.[3]  Petitioners filed joint Federal income tax returns and amended returns on the following dates:

| Year | Original Filed | Amended Filed |
|------|----------------|---------------|
| 1980 | Mar. 25, 1983  | Dec. 4, 1985  |
| 1981 | Mar. 25, 1983  | Dec. 4, 1985  |
| 1982 | Mar. 10, 1984  | Dec. 4, 1985  |
| 1983 | June 23, 1984  | Dec. 4, 1985  |

---

[1] Section references are to the Internal Revenue Code in effect for the taxable years under consideration.  Rule references are to this Court's Rules of Practice and Procedure.

[2] The parties' stipulation of facts and the attached exhibits are incorporated by this reference.

[3] Jack R. Prewitt maintained his residence in St. Petersburg, Florida, but at the time the petition was filed, he was incarcerated in the Federal Prison Camp located on Tyndall Air Force Base, which is situated in the State of Florida.

The amended returns for 1980 through 1982 claimed refunds of tax attributable to the carryback of investment tax and business energy credits from the 1983 taxable year. The 1983 amended return sought a refund of tax based on claims to deductions for management fees and investment tax and business energy credits in the amount of $11,500 each. Petitioners also amended their 1979 return on December 4, 1985, to "remove" investment tax and business energy credits that had originally been carried back from the 1982 taxable year.

Jack R. Prewitt (petitioner) took courses at Purdue University's school of estate planning and is knowledgeable in tax matters. Around 1978, petitioner purchased, for $25,000, an insurance agency named "U.S. Estate Services, Inc." (Estate) from his partner, Norbert Roy (Roy). Roy was petitioner's tutor in an estate planning business, in which life insurance was used to fund the payment of estate tax. Petitioner focused his business activity in the area of estate planning for farm owners. He advertised in magazines oriented to farming, obtained leads, and then proceeded to sell insurance designed to pay the estate tax on farms (illiquid assets). His business expanded to the point where eight or nine planners (salespeople) were involved in the business. Eventually, petitioner's business became the number one such life insurance agency operating under a large insurance underwriter.

Because the premium on the amount of insurance needed to fund the estate tax liability for a farm was beyond the means of

many farmers, petitioner's selling strategy included conversion of whole life policies into universal life or annuity devices. Farmers with whole life policies were persuaded to surrender the policy and withdraw the cash surrender value, or some portion thereof, to purchase other forms of insurance in larger amounts. It was the conversion from one type of insurance to another or to an annuity that generated revenue for petitioner.

In 1981, Roy sought to become reaffiliated with petitioner. Petitioner and Roy became loosely affiliated, in that they each operated separate insurance agencies and shared some common overhead and administrative expenses. During September 1982, Roy introduced petitioner to Dean Cooper (Cooper), who along with Roy had a plan to acquire a small insurance company with 5,000 policyholders, named "United Savings Life" (United), of Hinsdale, Illinois.

On September 24, 1982, Mid-Continent Acquisitions Corp. was organized for the purpose of acquiring insurance companies, and Mid-Continent Marketing Corp. was organized for the purpose of marketing insurance. Petitioner was a director and officer of both corporations.

In order to acquire United, new customers were solicited and persuaded to surrender their life insurance policies and invest the cash surrender value in securities (shares of stock or debt instruments denoted "money multiplier notes") issued by the corporations formed by Roy, Cooper, and petitioner. The money received by the Mid-Continent corporations from sale of the

securities was supposed to be used to purchase United, but, instead, it was paid out to employees and officers as salary and bonuses. The corporations did not fund the purchase of United or reinvest the securities proceeds in assets or income-producing entities. Mid-Continent Acquisitions attempted to sell $21,600,000 of money multiplier notes, and Mid-Continent Marketing attempted to sell $8,640,000 of money multiplier notes. Farmers were told that they would receive a guaranteed income of 15 percent from their Mid-Continent securities investment. Essentially, the farmers had invested their life insurance cash surrender values in what had evolved into a Ponzi scheme.

Of approximately $3 million of the Mid-Continent corporations' securities sold during 1982 and 1983 (approximately $600,000 during 1982), over $1 million went to petitioner, Roy, and Cooper as salaries and bonuses. After the Mid-Continent corporations were organized, petitioner continued to operate Estate, an S corporation.

Petitioners included $110,000 of income from the Mid-Continent corporations on their 1982 income tax return. That income was reflected in the category "Other income" as "Reimbursement of Pre-Incorporation Expenses". Petitioner did not incur preincorporation expenses in connection with the organization of the Mid-Continent corporations. No documentation concerning said preincorporation expenses was provided to the corporation income tax return preparer, J. Richard Home (Home), a Certified Public Accountant. Home required petitioner, Roy, and

Cooper to sign documents indicating that they each received a total of $110,000 in reimbursed preincorporation expenses from the Mid-Continent corporations. Petitioner, in the same document, acknowledged a $100,000 account payable of Mid-Continent Acquisition Corp. to petitioner. Home prepared the 1982 Federal income tax returns for the Mid-Continent corporations and petitioners. The preincorporation expenses reported by petitioners and the others were set up on the Mid-Continent corporations' books as an intangible asset, which was to be amortized over 60 months.

Home did the bookkeeping for Estate, and when petitioner made a payment with business funds that could not be identified as having a business purpose, no deduction for such amount was claimed on the S corporation's return. For 1982 and 1983, $108,000 and $121,000, respectively, fell into the nondeductible category, and Home reflected the amounts as loans to shareholders on financial records and tax returns for Estate. The total amount of loans outstanding as of the end of Estate's 1983 year was $229,000.

During August and September 1983, petitioner received a $6,265.25 salary check from each of the two Mid-Continent corporations. Withholding tax had been taken from the salary checks, and the payments were recorded in the corporate payroll journals. During November 1983, following a meeting between petitioner and Roy, the bookkeeper was told to change the salary

entries to management fees and to refund the withholding to petitioner.

For 1983, petitioner received $60,000 from the Mid-Continent corporations, which was not reported on petitioners' 1983 income tax return. Petitioner, during 1983, received $21,000 in management fees from the Mid-Continent corporations, which he failed to report on petitioners' 1983 income tax return. Petitioner did not advise Home of the management fees received from the Mid-Continent corporations.

A criminal investigation of Cooper was begun in Illinois, involving activity similar to that of the Mid-Continent corporations, and he resigned from the corporations. Thereafter, around August 2, 1983, the State of Indiana, where petitioner and the corporations did business, issued a cease and desist order, based on alleged securities violations, against the corporations, prohibiting them from selling shares of stock. After the court order, the Mid-Continent corporations were, for all practical purposes, no longer operating.

Petitioner personally continued the business activity of the Mid-Continent corporations after the cease and desist order. Obligations of the Mid-Continent corporations were paid with checks drawn on his S corporation's (Estate) checking account as follows:

|  | 1983 | 1984 |
|---|---|---|
| Helicopter | $30,297.50 | $8,172.17 |
| Expense reimbursement to Ballinger | 2,680.50 | --- |
| Payments to the Mid-Continent corporations' customers | --- | 26,001.58 |

Legal and accounting                    ---         10,979.51

These payments were made in order to continue petitioner's insurance sales business activity during and after the ruin of the Mid-Continent corporations.

After the situation of the Mid-Continent corporations began to deteriorate, Roy and petitioner considered purchasing an insurance agency to generate business and to ameliorate their problems. Home was requested to evaluate the Riley Insurance Agency (Riley), and he supplied a report, dated August 29, 1983, to Roy and petitioner. After some negotiations through legal counsel, an agreement was reached, and Roy paid $500 as earnest money or a downpayment sometime during the period September through November 1983.

On March 28, 1984, Roy executed a written contract with Gwen Riley to pay $135,000 for Riley. The $135,000 price had been formulated and agreed upon during 1983. The $134,500 balance of the contract price was remitted by Roy to Gwen Riley during March 1984. Roy and petitioner had agreed in 1983 to each end up owning one-half of Riley, and that agreement was committed to writing during April 1984. Petitioner paid Roy $67,500 for one-half of Riley by checks during the spring of 1984.

Petitioner claims a $90,000 offset against his 1983 income for repayment of preincorporation expenses reimbursement received in 1982. Petitioner and Roy agreed to pay $5,000 per month to the Mid-Continent corporations from the revenues of Riley. The agreements were reduced to writings that recited that the Mid-

Continent corporations were to be repaid a total of $180,000, which Roy and petitioner had received as reimbursements of preincorporation expenses.

During a June 1, 1984, meeting, Home was advised by petitioner that petitioner and Roy had purchased Riley and they had given their interests in Riley to the Mid-Continent corporations to repay a portion of the reimbursement of preincorporation expenses that had been paid to petitioner and Roy in earlier years. Petitioner and Roy were not on good terms and had an acrimonious relationship. In a June 11, 1984, letter, investors of the Mid-Continent corporations were advised that Riley had been purchased. Roy advised policyholders of his company (American Planning Associates, Inc.) that his company had purchased Riley. Petitioner, who was president of International Financial Consultants, Inc. (International), by a January 16, 1985, letter to his policyholders, advised that International had purchased Riley.

Riley had about 4,000 active and inactive client files, and the clients' identities were essential to its business. The clients of Riley, an Indiana insurance agency, were split between Roy (A through K) and petitioner (L through Z). Petitioner advised Home that he purchased the interest in Riley during November 1983 and sold it to the Mid-Continent corporations during December 1983. Petitioner, on his 1983 income tax return, reported that he purchased Riley during November 1983 for $67,500 and that he sold it during December 1983 for $90,000. Home

reviewed this transaction before reporting it on petitioners' 1983 return and reached the conclusion that the sale to the Mid-Continent corporations occurred during 1983. Home believed that the downpayment was low, but that it was an installment sale that occurred during 1983. In subsequent research, Home discovered a revenue ruling (Rev. Rul. 234, 1953-2 C.B. 29) that permitted, for tax purposes, installment sales of intangibles.

Home prepared petitioners' 1983 income tax return and relied on representations of petitioner in preparing the return. Petitioner, for 1983, advised Home that he had made repayments of amounts received from the Mid-Continent corporations, and Home claimed $90,000 as repayment of the reimbursement of preincorporation expenses. The $90,000 was one-half of the claimed value of Riley that Roy and petitioner placed in the Mid-Continent corporations.

Petitioner also advised Home that he had incurred expenses during 1983 on behalf of the Mid-Continent corporations that could be considered repayment of amounts received from the corporations. Home, however, did not include them on the 1983 return because petitioner did not provide the details or specifics for the expenditures.

The State of Indiana did not pursue the securities charges on which the cease and desist order had been based; however, the Federal Government ultimately prosecuted, convicted, and sentenced to prison petitioner, Cooper, and Roy. Petitioner was indicted on June 9, 1988, on numerous counts, including one count

of conspiracy to commit fraud and numerous counts of mail fraud and for filing a false 1983 income tax return in violation of section 7206(1).  The indictment, among other charges, alleged that petitioner, on or about June 29, 1984, filed a materially false 1983 income tax return by failing to report a substantial amount of income in addition to that stated on the income tax return.  At the hearing under rule 11 of the Federal Rules of Criminal Procedure, petitioner admitted that he received and willfully failed to report a $21,000 management fee.  On May 2, 1990, petitioner pled guilty to filing a materially false 1983 income tax return under section 7206(1), and he was sentenced to concurrent 3-year terms of imprisonment, along with the condition that he make restitution to the crime victims.

## OPINION

This case is factually convoluted because of the maze of entities, principals, and transactions involved.  The primary factual pattern involves petitioner's odyssey from being a successful insurance salesman to his involvement in a Ponzi scheme and, ultimately, to his incarceration.  Initially, petitioner successfully sold insurance to farmers until he became reinvolved with his insurance business mentor, Roy.  Roy, in turn, introduced Dean Cooper to petitioner.  With the introduction of Roy and Cooper, petitioner's business activity became complicated.  In addition to an S corporation through which petitioner operated his life insurance agency, Roy's insurance agency became affiliated with petitioner through and in

combination with the Mid-Continent corporations. Those corporations were intended to generate capital for the purchase of an insurance company, but evolved into shells for a Ponzi scheme.

Petitioners have agreed that they failed to report $81,000 of income for 1983. Petitioners, however, contend that they are entitled to deduct expenses of the Mid-Continent corporations that were paid during and after the corporations ceased operation. To the extent those amounts were paid, payment was made with checks from petitioner's S corporation and petitioners seek to deduct the amounts on their individual 1983 income tax return. Finally, petitioners contend that they are entitled to a $90,000 deduction for their 1983 tax year in connection with the purchase and disposal of Riley. This amount has been characterized as a refund or repayment to the Mid-Continent corporations of the preincorporation payments petitioner had received during 1982. We address each of these matters separately.

Payments of the Mid-Continent Corporations' Expenses-- Petitioner admits that he failed to report $81,000 ($60,000 plus $21,000) of income from the Mid-Continent corporations for 1983, but contends that he paid corporate expenses which more than offset the $81,000 of unreported income. No deduction for such expenses was reported or claimed on his 1983 return.

First, it must be noted that the payments proven by petitioners total about $78,000. In that regard, about $33,000

of the payments were made by checks dated in 1983 and about $45,000 of the payments were made by checks dated in 1984. Petitioners' individual return was filed on a calendar year basis and, accordingly, the 1984 payments ($45,000) would not be deductible for the 1983 taxable year.

Ordinarily, for a payment to be deductible under section 162, it must be made by the taxpayer as an ordinary and necessary expense of the taxpayer's own business. Betson v. Commissioner, 802 F.2d 365, 368 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Gantner v. Commissioner, 91 T.C. 713, 725 (1988), affd. 905 F.2d 241 (8th Cir. 1990); Lohrke v. Commissioner, 48 T.C. 679, 684-685 (1967).

The initial obligation for the $33,000 of payments in 1983 (reimbursement of salesmen's expenses of $2,680.50 and helicopter expense of $30,297) was that of the Mid-Continent corporations. The payments, however, were made by checks drawn on the checking account of petitioner's S corporation at a time when the Mid-Continent corporations had ceased operations and were under a court order not to operate. In order to continue the sale of insurance and his flow of income, petitioner had to see to the payment of the outstanding obligations of the Mid-Continent corporations to salespeople and suppliers of goods and services. Although he was no longer involved in the Ponzi type activity, petitioner continued to exploit the customer lists from Riley and, in general, to sell term insurance to farmers. There is no

suggestion that petitioner had other choices or means of continuing income-producing activity.

Generally, expenditures by a substantial shareholder for the benefit of his corporation are deemed capital and are not deductible due to a lack of connection with the shareholder/taxpayer's own trade or business. Deputy v. du Pont, 308 U.S. 488 (1940). However, where a taxpayer makes expenditures to protect or promote his own business, the expenditure may be deductible, "even though the transaction giving rise to the expenditures originated with another person and would have been deductible by that person if payment had been made by him." Lohrke v. Commissioner, supra at 685 (and cases cited therein).

In this case, the expenditures were made to protect and promote petitioner's insurance business. Here the income-producing asset consisted of the names of clients and potential clients. Following the cease and desist order, the clients could no longer be sold securities of the Mid-Continent corporations, and petitioner pursued the sale of insurance. Because Riley's assets had been intermingled within the Mid-Continent corporations' assets, the Mid-Continent corporations' obligations were associated with Riley's client list and its use. Payment of the corporations' obligations was necessary to protect petitioners' own insurance business. Accordingly, the expenditures pass the Lohrke test.

The question remains, however, whether petitioner is entitled to the deduction even though payment was made with checks drawn on the account of his S corporation. A review of the S corporation's returns for the fiscal years ended March 31, 1983 and 1984, does not reflect that expenses in similar categories were claimed in amounts approaching those claimed by petitioners regarding the Mid-Continent corporations. For example, no amount was claimed for the helicopter for the 1982 fiscal year, and $7,900 was claimed for the 1983 fiscal year, whereas the amount paid for the helicopter during 1983 and claimed by petitioners is $35,355.50.

In addition, it was the practice of Home, the accountant, to classify expenditures of petitioner, which were not Estate's business expenses, as loans to shareholders. In that connection, for 1982 and 1983, $108,000 and $121,000 fell into the nondeductible category, and Home reflected the amounts as shareholder loans on financial records and tax returns for Estate. The total loans outstanding as of the end of Estate's 1983 year were $229,000.

Under these circumstances, we find that petitioner has shown that the amounts being claimed have not been deducted in connection with petitioner's S corporation and that the expenditures, although made by the S corporation, were made on petitioner's behalf. Because petitioners report income and expenses on a calendar year basis, they are entitled to deduct only those payments made during the 1983 year--$33,000.

The $90,000 Riley Transaction--Petitioner, during 1982, had received $110,000 from the Mid-Continent corporations for alleged reimbursement of preincorporation expenses. Petitioner did not actually incur preincorporation expenses, but reported the $110,000 as income on petitioners' 1982 joint Federal income tax return. For 1983, petitioners claimed a $90,000 repayment to the Mid-Continent corporations of the preincorporation expenses. The amount is reflected on Schedule D by an entry that reported a sale of petitioner's interest in Riley during December 1983 for $90,000, and a purchase of the interest during November 1983 for $67,500; a short-term capital gain of $22,500 is reported for the transaction. In another part of petitioners' 1983 return, the $90,000 is reflected as a repayment of reimbursed preincorporation expenses and used to reduce other income.

Petitioner explains the Schedule D reporting of this transaction was intended to reflect a contribution of Riley to the Mid-Continent corporations. The Riley scenario is convoluted. Initially, the $110,000 was taken from the Mid-Continent corporations as reimbursement for preincorporation expenses, when none was actually incurred. We surmise that this approach was used to provide some tax benefit. The "contribution" of Riley by petitioner and Roy, which was characterized as a refund of the reimbursement, is without substance. Petitioner and Roy each divided the 4,000 or so customers of Riley and proceeded to earn income from selling insurance to Riley customers. The only asset of Riley, with any

value, was its customer list. Accordingly, the contribution of the remaining shell, after removal of the customer list, was a mere gesture without substance.

Petitioner's and Roy's promise to pay some or all of the proceeds from the receipts due to use of the customer lists is but a promise and does not constitute an event for which a deduction is allowable. The Mid-Continent corporations were controlled by petitioner and Roy. Moreover, petitioner has not shown that payments were made to the Mid-Continent corporations that would entitle petitioners to a deduction for repayment of reimbursed preincorporation expenses for their 1983 taxable year. Accordingly, petitioners are not entitled to any part of the $90,000 claimed and disallowed by respondent. In addition, because we have found that no value was in fact transferred to the Mid-Continent corporations in the form of Riley, petitioners are not required to report the short-term capital gain attributable to that transaction.

Additions to Tax for Fraud--Respondent determined that underpayments on petitioners' returns for 1980, 1981, 1982, and 1983 were due to fraud within the meaning of section 6653(b). Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Miller v. Commissioner, 94 T.C. 316, 332 (1990) (citing Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958)). Respondent has the burden of proving, by clear and convincing evidence, that an underpayment exists for each of the years at issue, and that some portion of the underpayment is due

to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 378 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud--only that some part of the underpayment of tax for each year at issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. Petitioners concede that there was unreported income for each year at issue. We accordingly must decide whether any part of the underpayments was due to fraud. Hebrank v. Commissioner, 81 T.C. 640 (1983).

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). Fraud may not be found under "circumstances which at the most create only suspicion." Davis v. Commissioner, 184 F.2d 86, 87 (10th

Cir. 1950); Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). However, fraud may be proved by circumstantial evidence and reasonably inferred from the facts, because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra; Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984). A taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, supra at 499.

Courts have relied on several indicia of fraud when considering the section 6653(b) addition to tax. Although no single factor may conclusively establish fraud, the existence of several indicia may be persuasive circumstantial evidence of such. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Beaver v. Commissioner, supra at 93.

Circumstantial evidence that may give rise to a finding of fraudulent intent includes: (1) Understating income; (2) keeping inadequate or no records; (3) failing to file tax returns; (4) maintaining implausible or inconsistent explanations of behavior; (5) concealing assets; (6) failing to cooperate with tax authorities; (7) filing false Forms W-4; (8) failing to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal an illegal

activity.  Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; see Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990).  These "badges of fraud" are nonexclusive.  Miller v. Commissioner, supra at 334.  Both the taxpayer's background and the context of the events in question may be considered as circumstantial evidence of fraud.  United States v. Murdock, 290 U.S. 389, 395 (1933); Spies v. United States, supra at 497; Plunkett v. Commissioner, supra at 303.

Respondent argues that petitioners knowingly failed to report $81,000 ($60,000 plus $21,000) for 1983 and that petitioner pled guilty to violating section 7206(1) with respect to the $21,000 item.  Although petitioner pled guilty to violation of section 7206(1), he is not estopped to deny that his 1983 tax return was fraudulent within the meaning of section 6653(b).  Wright v. Commissioner, 84 T.C. 636 (1985). Petitioner, however, is estopped to deny that he filed a materially false return under section 7206(1).  Id.

Petitioners do not deny that the $81,000 was omitted; however, they assert that they failed to claim more than $80,000[4] of deductions on their 1983 return.  The $81,000 omission is probative evidence.  Petitioners' contention that they were entitled to unclaimed and offsetting deductions for 1983 does not lessen the impact of petitioners' intentional failure to report income.

_____

[4] We have found that the amount allowable for 1983 totals $33,000.

Several other indicia of fraud are extant here. There was some concealment and deception. Petitioner's records were, to some extent, inadequate or intentionally misstated. Petitioner was not an innocent bystander in the events that, ultimately, caused his incarceration. He was involved in fraudulent activity concerning the Mid-Continent corporations, and he failed to report $60,000 of so-called reimbursed preincorporation expenses, which he knew was includable in income from his 1982 reporting of the $110,000 amount. We have also considered petitioner's background and level of sophistication in taxation.

Respondent has clearly and convincingly proven that petitioners' 1983 joint Federal income tax return was fraudulent within the meaning of section 6653(b). In this regard, the entire underpayment is due to fraud.

Respondent also determined an addition for fraud for each of the years 1980 through 1982; however, no evidence was offered at trial or arguments made on brief in support of that determination. Accordingly, we hold that respondent has not shown that petitioners' 1980, 1981, and 1982 returns were fraudulent.

Period for Assessment--Respondent's notice of deficiency for the taxable years 1980 through 1983 was mailed November 20, 1991. Petitioners have placed in issue whether the period for assessment has expired with respect to the years before the Court. The last of the returns for the years in question was filed on June 23, 1984. Accordingly, the normal 3-year period

for assessment would have expired prior to respondent's issuance of the November 20, 1991, notice of deficiency.  Sec. 6501(a).

With respect to the 1983 taxable year, respondent has proven that the return was fraudulent within the meaning of section 6653(b), and, accordingly, section 6501(c)(1) would apply.  That section provides that tax may be assessed at any time in the case of a fraudulent return filed with intent to evade tax. Accordingly, the period for assessment had not expired with respect to the 1983 taxable year at the time respondent issued the notice of deficiency to petitioners.

With respect to 1980 through 1982, we have found that the addition to tax for fraud is not applicable.  The 1980 through 1982 taxable years are in issue solely due to the carryback of credits from the 1983 taxable year.  Petitioners have conceded that they are not entitled to the disallowed credits, and but for the expiration of the assessment period, respondent's determination would be sustained.

Section 6501(j), however, provides that deficiencies attributable to a credit carryback may be assessed at any time before the expiration of the period for assessing a deficiency for the taxable year from which the credit emanates. Accordingly, we find that the period for assessment had not expired for the 1980 through 1982 taxable years at the time respondent issued the notice of deficiency to petitioners.

To reflect the foregoing,

Decision will be entered

under Rule 155.